Judith D. BERNS, Phyllis A. Browne, and Sixty-One other named individuals, Plaintiffs-Appellants-Petitioners,

v.

WISCONSIN EMPLOYMENT RELATIONS COMMISSION, Defendant-Respondent.

Supreme Court

*No. 79–359. Argued October 27, 1980.—*
*Decided November 25, 1980.*

(Also reported in 299 N.W.2d 248.)

For the petitioners there were briefs by *David T. Bryant, Rex H. Reed* of National Right to Work Legal De-

fense Foundation, Inc., Springfield, Virginia, and *Willis B. Ferebee* of Milwaukee, and oral argument by *David T. Bryant* and *Willis B. Ferebee.*

For the respondent the cause was argued by *John D. Niemisto,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

For Milwaukee District Council 48, there was a brief by *Nola J. Hitchcock Cross* and *Podell, Ugent & Cross, S.C.,* of Milwaukee, and oral argument by *Nola J. Hitchcock Cross.*

WILLIAM G. CALLOW, J. The court of appeals affirmed the order and judgment of the circuit court for Milwaukee county, the Honorable George A. Burns, Jr., presiding, which affirmed an order of the Wisconsin Employment Relations Commission. On this review we are presented with the question whether a "fair-share" provision in a collective bargaining agreement between a municipal employer and a union may, by its terms, be given retroactive effect. We conclude it may, and we affirm the decision of the court of appeals.

Petitioners Berns and Browne initiated this action on February 23, 1976, by filing with the Wisconsin Employment Relations Commission (Commission) a prohibited practices complaint charging the Milwaukee Board of School Directors (School Board), Local 1053 affiliated with District Council 48, AFSCME, AFL–CIO, and District Council 48 (Unions) with conduct in violation of sec. 111.70 (3) (a) 6,[1] 111.70 (3) (b) 2,[2] and 111.70

---

[1] Sec. 111.70 (3) (a) 6, Stats., provides:

"(3) PROHIBITED PRACTICES AND THEIR PREVENTION. (a) It is a prohibited practice for a municipal employer individually or in concert with others:

". . .

"6. To deduct labor organization dues from an employe's or supervisor's earnings, unless the municipal employer has been presented with an individual order therefor, signed by the municipal employe personally, and terminable by at least the end of

(3) (c),[3] Stats. The petitioners were subsequently permitted to amend their complaint to add the names of sixty-one other individuals similarly situated.

## I.

The dispute arises from the following facts. The petitioners were, at the time of the commencement of the action, employes of the School Board but not members of Local 1053. During 1973 through 1974 the petitioners were members of a collective bargaining unit represented by Local 1053 which, in its exclusive representative capacity, was a party to a collective bargaining agreement with the School Board. That agreement, which expired by its terms on December 31, 1974, included a fair-share provision which read as follows:

*"UNION SECURITY*
"1. *Fair Share Agreement.* All employes represented by the Union who have completed sixty calendar days of

any year of its life or earlier by the municipal employe giving at least 30 days' written notice of such termination to the municipal employer and to the representative organization, except where there is a fair-share agreement in effect."

[2] Sec. 111.70(3) (b)2, Stats., provides:

"(b) It is a prohibited practice for a municipal employe, individually or in concert with others:

". . .

"2. To coerce, intimidate or induce any officer or agent of a municipal employer to interfere with any of its employes in the enjoyment of their legal rights, including those guaranteed in sub. (2), or to engage in any practice with regard to its employes which would constitute a prohibited practice if undertaken by him on his own initiative."

[3] Sec. 111.70(3) (c), Stats., provides:

(c) It is a prohibited practice for any person to do or cause to be done on behalf of or in the interest of municipal employers or municipal employes, or in connection with or to influence the outcome of any controversy as to employment relations, any act prohibited by par. (a) or (b).

service with the Board, are compensated for forty-eight (48) or more hours in a month, and are not members of the Union shall be required, as a condition of employment, to pay to the Union each month a proportionate share of the cost of the collective bargaining process and contract administration. Such charge shall be deducted from the employe's paycheck in the same manner as Union dues and shall be the same amount as the Union charges for regular dues, not including special assessments or initiation fees."

Pursuant to that provision, deductions were made from the petitioners' paychecks during the term of the agreement and turned over to the local union.

Negotiations were in progress for a successor agreement when the 1973–1974 agreement expired. On December 31, 1974, the School Board offered by letter to extend the expiring agreement until a new agreement was reached. That offer was rejected by the Unions by letter of January 2, 1975, although the Unions expressed their intention to continue working until further notice. On February 3, 1975, at 2:50 a.m., the negotiators for the School Board and the Unions reached agreement on terms for the successor agreement and initialed a document which reads, in part, as follows:

"It is understood that the Union will agree to extend the previous contract to the date of ratification of the new contract."

A successor collective bargaining agreement was executed by the Board and the Unions on April 2, 1975. That agreement, which by its terms was made effective from January 1, 1975, through June 30, 1977, contained a fair-share clause identical to the one in the previous agreement.

The School Board, which had not made any fair-share deductions for the months of January, February, or March, 1975, resumed making deductions in April, 1975. Also in April of 1975 the president of the local union in-

formed all members of the bargaining unit that the new agreement was retroactive to January 1, 1975, and that fair-share deductions would be made for each month of 1975. It was not until late February, 1976, however, that deductions were taken from the paychecks of fair-share personnel in the amount of $6.50 per month for January, February, and March of 1975. It is the taking of these deductions for the hiatus period after the expiration of the predecessor labor agreement and before the ratification of the successor agreement which the petitioners claimed constituted a prohibited practice under the Municipal Employment Relations Act (MERA).

Hearings were held before a Commission hearing examiner on May 13 and July 23, 1976. The petitioners argued that the deductions for the three months in question were in violation of sec. 111.70(3) (a)6, Stats., since they were not made "where there is a fair-share agreement in effect." Critical to the petitioners' position is their view that the words "in effect" do not contemplate retroactive application of a fair-share agreement. On July 15, 1977, the Commission hearing examiner issued findings of fact and conclusions of law and an order accompanied by a written memorandum. In essence the hearing examiner concluded on two separate grounds that no prohibited practice was committed:

"a. respondents' February 3, 1975 agreement . . . extended their 1973–74 agreement, including fair-share, retroactively from January 1, 1975 through the date of mutual ratification of a successor agreement, and their ratification of a successor agreement . . . created an enforceable fair-share agreement in effect, *inter alia,* on and after said date of mutual ratification; and

"b. independent of (a) above, respondents' April 2, 1975 execution of their 1975–77 agreement, including fair-share, . . . created a fair-share agreement in effect retroactively as regards certain times from and after January 1, 1975 including January, February and March, 1975."

Relative to the question of retroactivity, the examiner concluded that MERA reflected a policy judgment that "desirable public policy ends are served" when nonunion bargaining unit members are required to pay their proportionate share of the costs involved in the bargaining process. Thus, he continued,

". . . That legislative judgment and purpose would logically be furthered by enforcing such agreements as regards all (but only) periods of time during which the labor organization was the exclusive representative of the bargaining unit involved, i.e., periods of time during which the labor organization was incurring the costs referred to in the statute in representing the bargaining unit employes from which deductions are sought.

"Furthermore, nothing in the above statutory language itself requires or warrants the conclusion that the Legislature intended to subject the enforceability of fair-share agreements to one or more of the following additional conditions:

"1. that they be in fact agreed upon at or before the period of time they are intended to be in effect;

"2. that deductions be made from paychecks issued in the month to which the deductions relate; or

"3. that they be implemented precisely as written (or become void for the period in which noncompliance occurs).

"Interpreted in the light of the foregoing analysis, Sec. 111.70(3)(a)6 permits fair-share deductions where the parties agree that such deductions should be made as regards a period of time past (throughout which the labor organization represented the deductee and the deductee's bargaining unit) even if that agreement is reached after the period of time to which the agreed-upon deductions relate, so long as the total deductions related to the past period do not exceed the 'amount of dues uniformly required of all members' as regards such period, and so long as the deductions are made after such retroactive agreement has been in fact reached between the labor organization and the municipal employer." (Footnote omitted.)

Accordingly, the hearing examiner found there was no prohibited practice committed by the School Board or the Unions, and he dismissed the complaint. On review the WERC affirmed the findings, conclusions, and order of the hearing examiner.

The petitioners then sought judicial review of the WERC order under Chapter 227, Stats. Both the School Board and the Unions were permitted to intervene in the trial court proceedings. At the trial court the petitioners conceded that, in view of the February 3 agreement extending the expired contract until a new one was ratified, the only deductions at issue were those covering the period from January 1 to February 3, 1975. The trial court affirmed the Commission's decision stating:

". . . sound legislative policy supports the Commission's construction that the effective dates of a fair-share agreement are dictated by the terms that the parties have agreed upon. Its holding here is wholly consistent with and furthers the salutary policy adopted by our legislature in 1971:

" 'A public policy of the state as to labor disputes arising in municipal employment to encourage voluntary settlement through the procedures of collective bargaining.' Sec. 111.70 (3) (a) 6, Wis. Stats., Cf. Sec. 10 Ch. 124, Session Laws (1971).

". . . A reading of the statute convinces us that there are no conditions precedent to the commencement of deductions pursuant to such an agreement, nor does it in any way restrict the parties from agreeing upon effective dates of the agreement. We agree with the thesis advanced by the Union in its brief that the terms of a particular fair-share agreement itself are determinative subject to two statutory limitations which are not applicable here."

The petitioners then appealed to the court of appeals which affirmed the trial court and held "we must agree

with the trial court that fair-share agreements become effective, and continue in effect by their own terms according to the parties' agreements and understandings." *Berns v. Wisconsin Employment Relations Comm.*, 94 Wis.2d 214, 223, 287 N.W.2d 829 (Ct. App. 1979).

## II.

Sec. 111.70(3)(a)6, Stats., prohibits otherwise unauthorized dues deductions "except where there is a fair-share agreement in effect." Petitioners argue that from January 1, 1975, through February 3, 1975, there was no collective bargaining agreement in effect and that, therefore, there was no fair-share provision in effect either. Citing a host of National Labor Relations Board and federal labor cases, the petitioners reason that the retroactive application of the fair-share agreement, pursuant to the retroactivity provision of the April 2, 1975, labor agreement, is unlawful. They argue that once the previous agreement expired on December 31, 1974, and before the February 3 extension was initialed, sec. 111.-70(2) gave them certain rights, among which was the right to refrain from lending any financial assistance to a labor organization. Once vested with that right, the petitioners claim they cannot be divested of it by a retrospective application of a fair-share provision. The sole question before us is whether the fair-share dues subsequently deducted for the period from January 1, 1975, through February 3, 1975, were made "where there [was] a fair-share agreement in effect," within the meaning of sec. 111.70(3)(a)6.

## (A)

At the outset we observe that the trial court determined that great weight should be given to the con-

struction and interpretation of a statute by an administrative agency. Relying on this court's decision in *Beloit Education Asso. v. WERC,* 73 Wis.2d 43, 242 N.W.2d 231 (1976), the trial court concluded that, while this was a matter of first impression for the courts, it reflected a WERC position that was long standing without governmental or judicial challenge. The court of appeals, relying on *Beloit* and *Department of Administration v. WERC,* 90 Wis.2d 426, 280 N.W.2d 150 (1979), chose instead to "carefully consider the WERC's ruling," but "refus[ing] to limit our review of the question." *Berns v. Wisconsin Employment Relations Comm., supra* at 221.

We have stated that the construction of a statute is a question of law, and this court is not bound by an interpretation given to a statute by an administrative agency. *Board of School Directors of Milwaukee v. WERC,* 42 Wis.2d 637, 650, 168 N.W.2d 92 (1969); *Milwaukee v. WERC,* 71 Wis.2d 709, 714, 239 N.W.2d 63 (1976). However, because the application of MERA requires the expertise of the Wisconsin Employment Relations Commission, where a commission's interpretation reflects a practice or position "long continued, substantially uniform and without challenge by governmental authorities and courts," we accord it great weight and sustain it if it is a rational interpretation of MERA. *Wood County v. Bd. of Vocational, T. & A. Ed.,* 60 Wis.2d 606, 618, 211 N.W.2d 617 (1973); *Beloit Education Asso. v. WERC, supra* at 67–68; *Glendale Prof. Policemen's Asso. v. Glendale,* 83 Wis.2d 90, 100, 264 N.W.2d 594 (1978). But where the question involved is "very nearly [one of] first impression," we do not use the "great weight" standard but, instead, accord to the interpretation due weight in determining what the appropriate construction should be. *Beloit Education Asso. v. WERC, supra* at 68; *Department of Administration v. WERC, supra* at 430.

In this case we have not been made aware of any long-standing practice or position of the Commission relative to the retroactive application of fair-share agreements. The statutory provision at issue was created by Chapter 124, Laws of 1971, effective November, 1971, and has not, as a consequence of its relatively recent creation, developed a history of consistent administrative application necessary to invoke our most deferential standard of review. Therefore we agree with the court of appeals that the interpretation given to sec. 111.70(3)(a)6, Stats., by the Commission, while entitled to due consideration, shall not limit the scope of our review.

(B)

Sec. 111.70, Stats., was substantially amended by Chapter 124, Laws of 1971. One significant change was the creation of sec. 111.70(4)(d)1,[4] which made the certified majority union the exclusive representative of all employes, both union members and nonmembers, in the collective bargaining unit. The 1971 amendments also

[4] Sec. 111.70(4)(d)1, Stats., provides:

"(d) *Selection of representatives and determination of appropriate units for collective bargaining.* 1. A representative chosen for the purposes of collective bargaining by a majority of the municipal employes voting in a collective bargaining unit shall be the exclusive representative of all employes in the unit for the purpose of collective bargaining. Any individual employe, or any minority group of employes in any collective bargaining unit, shall have the right to present grievances to the municipal employer in person or through representatives of their own choosing, and the municipal employer shall confer with said employe in relation thereto, if the majority representative has been afforded the opportunity to be present at the conferences. Any adjustment resulting from these conferences shall not be inconsistent with the conditions of employment established by the majority representative and the municipal employer."

introduced to MERA the concept of a fair-share agreement. Sec. 111.70(1)(h), created by that Act, defines a fair-share agreement as follows:

"(h) 'Fair-share agreement' means an agreement between a municipal employer and a labor organization under which all or any of the employes in the collective bargaining unit are required to pay their proportionate share of the cost of the collective bargaining process and contract administration measured by the amount of dues uniformly required of all members. Such an agreement shall contain a provision requiring the employer to deduct the amount of dues as certified by the labor organization from the earnings of the employes affected by said agreement and to pay the amount so deducted to the labor organization."

The new legislation also affected other provisions of MERA in order to accommodate fair-share agreements. Sec. 111.70(2), Stats., the employes' rights section, was amended to provide that "such employes shall have the right to refrain from any and all such activities except that employes may be required to pay dues in the manner provided in a fair-share agreement." Sec. 111.70, the section concerning prohibited practices, was repealed and recreated to provide, in subsection (3)(a)3, that it shall be a prohibited practice for an employer "[t]o encourage or discourage a membership in any labor organization by discrimination in regard to hiring, tenure, or other terms or conditions of employment; but the prohibition shall not apply to a fair-share agreement." Sec. 111.70(3)(a)6, the principal section at issue in this review, makes it a prohibited practice for an employer to deduct dues from an employe's earnings "except where there is a fair-share agreement in effect."

In *Milw. Fed. of Teachers, Local No. 252 v. WERC*, 83 Wis.2d 588, 266 N.W.2d 314 (1978), this court had occasion to consider these legislative changes in MERA. There we confronted the question whether the amend-

ments amounted to a sanctioning of exclusive dues checkoff rights for the majority union. Concluding that exclusive dues checkoff privileges were still impermissible under MERA, we stated:

". . . The legislative decision to permit the certified union to recoup some of its bargaining costs from nonunion bargaining unit employees is perfectly compatible with this court's holding that one union may not arrange a checkoff system to the exclusion of other unions. The first negates the possibility that there will be freeloaders who reap the benefits of collective bargaining without paying the cost; the latter tends to destroy competing unions or at least discourages membership in them. The legislature could very well permit the one without permitting the other." *Id.* at 599–600.

The availability of the fair-share device as protection against "freeloaders" who benefit from the efforts of the bargaining representative but who, being nonunion members, do not pay regular union dues is important in light of the duty imposed by statute upon the certified majority representative to bargain collectively on behalf of all unit members. *See:* Comment, *Union Security in the Public Sector: Defining Political Expenditures Related to Collective Bargaining,"* 1980 Wis. L. Rev. 134, 135 n. 6.

The petitioners' position is that the imposition of fairshare fees for the period from January 1 through February 3, 1975, was unlawful, even though they received the benefits of the newly negotiated successor agreement retroactively to January 1, 1975. This is inconsistent with the obvious aim of fair-share agreements to spread the cost of collective negotiations among all who enjoy the benefits of the bargain. The petitioners enjoyed the benefits of the successor agreement for the period from January 1 through February 3, and thus fair-share deductions for the same period are clearly in furtherance of the cost allocation rationale of fair share.

The Commission, in affirming the decision of the hearing examiner, stated:

". . . The Complainants' argument that the words 'in effect' found in Section 111.70(3)(a)6 of the MERA must be read to mean contemporaneously with the deductions, is likewise based on an unwarranted literal reading of the words utilized by the legislature."

Even more basic to the petitioners' reading of sec. 111.-70(3)(a)6, Stats., however, is their apparent interpretation of the word "where" to mean "when." At oral argument counsel for the petitioners insisted that there is a temporal reference contained in the word "where" that links the time to which the deductions are applicable to the time during which a fair-share agreement actually exists. We are not persuaded that the legislature intended to mean "when" in using the word "where" in this section.

In undertaking the construction of a statute, we must consider the purpose of the entire act. *Milwaukee County v. ILHR Dept.*, 80 Wis.2d 445, 453, 259 N.W.2d 118 (1977). Thus we consider the statute in relation to its scope, history, context, subject matter, and object to be accomplished or remedied. *State ex. rel. First Nat. Bank & Trust v. Skow,* 91 Wis.2d 773, 779, 284 N.W.2d 74 (1979).

Clearly the object to be accomplished by MERA is amply revealed by the language of sec. 111.70(6), Stats.[5]

_____

[5] Sec. 111.70(6), Stats., provides:

"(6) DECLARATION OF POLICY. The public policy of the state as to labor disputes arising in municipal employment is to encourage voluntary settlement through the procedures of collective bargaining. Accordingly, it is in the public interest that municipal employes so desiring be given an opportunity to bargain collectively with the municipal employer through a labor organization or other representative of the employes' own choice. If such procedures fail, the parties should have available to them a fair, speedy, ef-

The 1971 amendments to the Act establish that the certified majority representative shall be the exclusive bargaining representative of all the employes and provides for the negotiation of fair-share agreements. Specifically, sec. 111.70 (2) was amended to provide that employes have the right to refrain from participation in any labor organization "except that employes may be required to pay dues *in the manner provided in a fair-share* agreement." (Emphasis supplied.) This language focuses upon the terms of the fair-share agreement itself and leads us to believe that the legislature intended such agreements to be enforceable according to their terms. Rather than adopt the petitioners' view that sec. 111.70 (3) (a) 6 requires such an agreement to exist in fact, we find it more consistent with the general purposes of exclusive representation and fair-share agreements to construe the language "except where there is a fair-share agreement in effect" to refer to the terms of the agreement by which the parties agree it will be applied.

The Commission recognized that retroactivity is a way of life in labor negotiations. We, too, have recognized this concept. *See: Department of Administration v. WERC*, 90 Wis.2d at 432–33. The petitioners' argument that retroactive application of a fair-share agreement will legislate sec. 111.70 (2) out of existence is unpersuasive. The right of an employe to refrain from any organized labor activities is expressly qualified in that section by the permissible imposition of fair-share dues. That it is done retroactively is no less in keeping with the overall objective of fair-share agreements.

██

Concern is expressed by the petitioners that retroactive application of fair-share agreements could extend

fective and, above all, peaceful procedure for settlement as provided in this subchapter."

well beyond a hiatus period such as we have in this case. We are not prepared to establish a maximum limit to the permissible retroactivity of a fair-share agreement, but we do not see how such an agreement could extend retroactively beyond the effective date of the benefits whose cost the fees are meant to defray. In this case the fair-share agreement was made retroactive to the commencement of the term of the successor labor agreement. At no time were the petitioners made to pay for something they did not receive, nor were they required to pay during any period wherein union members were not required to pay. The procedure involved in this case, we believe, exemplifies a proper use of retroactivity to effectuate the purposes served by fair-share agreements.

The many federal labor cases cited by the petitioners do not persuade us that the retroactive application of the fair-share agreement is improper.[6] Those cases gen-

[6] The petitioners' brief cites numerous cases purporting to trace the "long history of administrative and court decisions on retroactivity under the LMRA [Labor Management Relations Act] which have uniformly held that such agreements cannot be applied retroactively." *For example: Serrick Corp.*, 8 NLRB 621 (1938), *enforced sub nom. Lodge No. 35, IAM v. NLRB*, 110 F.2d 29 (D.C. Cir. 1939), *aff'd*, 311 U.S. 72 (1940) (discharge of employe by retroactive application of a closed shop agreement unlawful); *Wallace Corporation*, 50 NLRB 138 (1943), *enforced sub nom. Wallace Corporation v. NLRB*, 141 F.2d 87 (4th Cir. 1944), *aff'd*, 323 U.S. 248 (discharge of employes pursuant to closed shop agreement for preagreement nonmembership unlawful); *Colonie Fibre Co., Inc.*, 69 NLRB 589, 71 NLRB 354 (1946), *enforced*, 163 F.2d 65 (2d Cir. 1947) (discharge of employes through retroactive application of maintenance of membership provision unlawful); *New York Shipbuilding Corp.*, 89 NLRB 1446, 26 LRRM 1124 (1950) (discharge of employe through retroactive application of maintenance of membership provision unlawful per *Colonie Fibre*); *General American Aerocoach Corp.*, 90 NLRB 239, 26 LRRM 1188 (1950) (discharge of employes through retroactive application of union shop agreement unlawful); *International*

erally stand for the proposition that a union security device cannot be invoked retroactively to secure the termination of an employe who fails to maintain a membership for some period of time prior to the actual execution of the agreement. We are not dealing with that kind of a union security device.

The policy and purpose underlying the concept of fair share is promoted by a construction of sec. 111.70 (3) (a) 6, Stats., which permits the fair-share agreement to apply retroactively to the period for which the employe receives benefits. We therefore affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

*Chemical Workers Union, Local 112,* 237 NLRB No. 96, 99 LRRM 1152 (1978) (union dues may not be collected for hiatus period by retroactive application of union security device).

These and other cases cited by the petitioners do not involve fair-share agreements but, rather, other union security devices generally designed to predicate continued employment upon union membership. The fair-share agreement involved here does not compel union membership, nor can it be invoked to effect the discharge of any employe.