Sisters Mary Joanne KOLLASCH, Mary David Walgenbach, Mary Raphael Hilger, Mary Concepta Tritz, Mary Philomena Head, Mary Baptista Schlitz, Mary Camillus Vandervoorde, Mary Grace Verzani, Mary Cora Marie Kesner, Mary Patricia Delaney, Mary Agatha Bermel, Mary Margaret Mary Finney, Mary Helen Goebel, Mary Martha Glaser, Mary Joyce Jungles, Mary Loretta Harvey, Mary Danielle Walgenbach, Mary Marian Siedschlag, Mary Sylvia Kimberley, and Sisters of St. Benedict, of Madison, Wisconsin, a Wisconsin corporation, Plaintiffs-Appellants-Petitioners,

v.

David W. ADAMANY, Secretary of the Department of Revenue, Defendant-Respondent.

Supreme Court

*No. 79–1579. Argued September 8, 1981.—*
*Decided December 1, 1981.*

(Also reported in 313 N.W.2d 47.)

For the petitioners there were briefs by *Trayton L. Lathrop, Michael J. Lawton, Michael H. Barton, Shelly J. Safer, Mary B. Lathrop* and *Isaksen, Lathrop, Esch, Hart & Clark,* and oral argument by *Trayton L. Lathrop,* all of Madison.

For the respondents the cause was argued by *Gerald S. Wilcox,* assistant attorney general, with whom on the brief were *Bronson C. La Follette,* attorney general, *John E. Armstrong* and *E. Weston Wood,* assistant attorneys general.

DAY, J. The question is, are the Sisters of St. Benedict, in carrying out their religious work subject to the Wisconsin sales tax for that portion of charges made to guests for lodging, food and use of facilities which is allocable to meals?

The majority of the court concludes that the Sisters in furnishing meals to their guests are not "retailers" within the meaning of sec. 77.51(7), Stats. 1973, and not subject to the tax.

Because we hold that the sales tax statute, sec. 77.51, *et seq.,* Stats. 1979, does not apply, we do not reach the issue decided by the court of appeals of whether the sales tax is an unconstitutional burden on the Sisters' free exercise of religion.

The plaintiffs in this action for declaratory judgment are members of a monastic community or priory of Roman Catholic women known as the Sisters of St. Benedict of Madison, Wisconsin.

This action was precipitated when the state advised the Sisters through their attorney that they were required to pay the sales tax and subject to statutory sanctions for failure to pay it in the past.

The Sisters follow the Rule of St. Benedict[1] in their individual and collective lives. The rule does not specify the type of work which its adherents should do. The work which is done is dictated by the area in which the monks or Sisters live, and by the circumstances of the time. During the time of St. Benedict, there was a great need to develop agriculture, and the monks helped people develop the skills needed to create productive fields and grow crops. In the middle ages, there was a need to preserve knowledge and writings, and the monasteries became centers of learning and preservation of culture. In modern times, the Sisters' work has emphasized schools, hospitals, orphanages, homes for unwed mothers, and similar work. More recently, the order has been active in furthering ecumenism, or the bringing together in an atmosphere of dialog and mutual respect people of other persuasions in accordance with the precepts of the Second Vatican Council started by Pope John XXIII and continued under Pope Paul VI. Such work has become the principal activity at the Sisters' facilities[2] involved here.

The following facts are taken from the uncontradicted testimony given at the hearing held in Dane county cir-

[1] St. Benedict was an Italian monk who lived in the fifth and sixth century. He was the author of a rule for monastic living that is followed even today, not only by Benedictines but by some of the other monastic orders as well. (Rules that govern many other monastic orders are those of Saints Basil, Augustine and Francis.)

[2] The facilities consist of two buildings located on 135 acres of wooded land: the Center Building and Unity Hall. The Center Building houses a dining hall, an auditorium, six conference rooms, a library, a chapel, and forty-three bedrooms. Unity Hall has thirty-three bedrooms, three conference rooms, two lounges, a kitchen, a chapel, and a large recreation room. The facilities can accommodate over 100 people overnight and up to 350 people in the meeting rooms. Outdoor recreational opportunities available at the center include swimming, tennis, hiking, basketball and similar activities.

cuit court on March 28 and 29, 1978, and from the exhibits which were received in evidence.

The priory is incorporated under the name "Sisters of St. Benedict of Madison, Wisconsin" and is part of the Federation of St. Gertrude, a confederation of fifteen autonomous religious communities.

The Rule of St. Benedict consists of a prologue and seventy-three chapters which deal with the government of a monastery, ascetical principles, religious services, property, daily life, appointment of the head of the monastery, community life and similar matters.

The Sisters direct our attention especially to chapter 53, "on the reception of guests," which begins, "Let all guests who arrive be received like Christ for he is going to say, 'I came as a guest, and you received Me.' "[3]

The Benedictine communities which comprise the Federation of St. Gertrude engage in activities which they believe are appropriate for the time and their location. As times change and the communities relocate or expand, the work which the sisters do changes accordingly. When the sisters first arrived in Madison,[4] they came in response to a call to start a girl's school. The

---

[3] Chapter 53, Rule of St. Benedict, also provides as follows:

"As soon as a guest is announced, therefrom, let the Superior or the brethren meet him with all charitable service. . . .

"After the guests have been received and taken to prayer, let the Superior or someone appointed by him sit with them. . . . The Superior shall break his fast for the sake of a guest, unless it happens to be a principal fast day which may not be violated. . . .

"Let there be a separate kitchen for the Abbot and guests, that the brethren may not be disturbed when guests, who are never lacking in a monastery, arrive at irregular hours. . . .

"The guest house also shall be assigned to a brother whose soul is possessed by the fear of God. Let there be a sufficient number of beds made up in it; and let the house of God be managed by prudent men and in a prudent manner."

[4] The foundress of these sisters' community, Mother Gertrude, began her work in Indian territory in the 1870's. The sisters went to Elkton, South Dakota, where they founded a school for Indian

facilities were constructed to house the school, as well as provide living quarters for the students and the sisters.

During the mid-sixties, the Sisters began offering weekend religious retreats at the center. The Sisters ultimately decided that their ability to provide retreats and a central gathering place for those interested in furthering ecumenism was of greater worth to the community than was their school. As Sister Mary Joanne Kollasch, former principal of the school, said: "When I was out recruiting students . . . the other work so to speak was knocking at our door . . ." They closed the school, eventually named their facilities "St. Benedict Center," and began to develop retreats and conferences consistent with their purpose of furthering an ecumenical dialogue within the city. They also believed that the reception of guests at the center was consistent with chapter 53 of the Rule of St. Benedict.

The Sisters and members of the center's advisory board were concerned that the activities of the center would be focused too narrowly. The Sisters and others active in the center's work wanted to carry on a continuing dialogue with as much of the community as possible. They did not want to limit access to the center solely to religious leaders and other church groups. Reverend Father Philip Sartorius Kaufman, O.S.B. (Order of St. Benedict) testified:

"I think it would be extremely un-Christian to limit the guests to people from organized religion . . . the whole Christian thrust calls for openness to all."

children. After the school burned down, the sisters went to Sioux City, Iowa. There they began an orphanage and a boarding home for young women. When it became evident that the area needed a hospital, they established one. They also started a home for unwed mothers. Bishop O'Connor of the Diocese of Madison requested their help in staffing a Madison school, and some of the sisters moved to Madison from Sioux City, Iowa for that purpose in 1953.

Sister Mary Joanne Kollasch, former Prioress of the center, testified:

"We do not wish to speak only to ourselves. We wish to speak in dialogue with other groups: not necessarily those who are professedly religious groups; and so that encounter, that dialogue, is part of our exercising our ministry in the Madison Community."

She testified, as did others, that she is in nowise engaged in "commercial" activity. Toward the end of broadening the base of people who made use of the center, the Sisters sent letters to some businesses offering the use of the center as a meeting place. The Sisters make the decision as to who will be accepted as guests.

The center has been used as a meeting place by government agencies, university groups, church groups, nonprofit organizations, and to a small extent by business groups. The center provides several meeting rooms, including a large auditorium for these groups to use. It also offers outdoor recreational opportunities. The center provides overnight use of the facilities for a fixed fee, including a room, linens, three meals, two coffee breaks, and facility use. It also provides, again for a fixed fee, daytime facility use, including lunch and coffee breaks, and evening facility use, including dinner and one coffee break. Based on their own experience, they often charge a smaller fee to religious organizations.

The day starts with common prayer to which guests are invited to participate, followed by breakfast. At 11:45 a.m., a prayer service, open to all, is held and followed by the noon meal. Vespers are at 5:15 p.m., followed by supper. Participation by guests in the religious services is purely voluntary.

The food which the Sisters prepare was described by one of them as "simple," and normally includes vegetables grown in the center's garden. There is no menu. The rooms and their furnishings provided for overnight stay

were also described as simple and rather spartan. Guests are expected to make up their own beds when they arrive.

The following is a breakdown of charges for meals served to the various types of groups which used the center from 1969 to 1973:

| Year | Church nonprofit | nonprofit organizations | Government agencies | University groups | Business groups | TOTAL |
|---|---|---|---|---|---|---|
| 1969 | $ 7,709.25 | $1,939.75 | ---- | $ 285.50 | $ 135.00 | $10,069.50 |
| 1970 | 7,693.00 | 969.00 | $ 772.20 | 1,077.50 | --- | 10,511.70 |
| 1971 | 7,483.41 | 1,173.61 | 2,001.00 | 1,502.46 | 16.00 | 12,176.48 |
| 1972 | 12,062.62 | 3,971.75 | 3,749.75 | 1,287.75 | 795.50 | 21,867.37 |
| 1973 | 13,857.00 | 7,205.50 | 5,171.00 | 1,105.00 | 845.00 | 28,183.50 |
| 1969–1973 | $48,805.28 | $15,259.61 | $11,693.95 | $5,258.21 | $1,791.50 | $82,808.55 |

In accordance with the Rule-of St. Benedict, if a guest arrives who cannot afford to pay for food or lodging, he is not turned away but is asked to do some work around the center in exchange for the Sisters' hospitality.[5] Even those guests who pay are invited to help with the dishes.

Guests at the center are given a short orientation lecture on the center and are invited to attend the daily prayer services if they wish to do so. The Sisters join the guests at their meals and converse with them. They generally do not discuss religion during their meals with guests unless the guests bring the subject up.

[5] Father Philip Sartorius Kaufman, O.S.B. testified:
". . . at an earlier period a monastery was pretty well self-sufficient. They had their own gardens, their own herd, everything. The guests came and the policy through the centuries was that those guests who couldn't pay didn't pay. They were usually, however, asked to do some kind of work. . . *one can corrupt those we are trying to help with the wrong kind of charity.* . . ." (Emphasis added.)

This action for declaratory judgment was precipitated when the Sisters' attorney received a letter dated January 10, 1974, from a representative of the department which stated that it would be necessary to have St. Benedict Center register for sales tax, obtain a permit, and make records for sale of meals available from September 1, 1969, to date. He also received a letter dated February 8, 1974, stating that the Sisters fell within the definition of "retailer" provided in sec. 77.51 (7) (a), Stats., and that the gross receipts from their sale of meals were subject to taxation. Sec. 77.52 (12), provides that any person who operates as a seller in the state of Wisconsin without a permit is guilty of a misdemeanor.

The Sisters brought this action for a declaratory judgment that they were not liable for the sales tax and also asked that the department be enjoined from attempting to penalize them for failure to obtain a sales tax permit and from requiring them to pay a tax on meals they furnished to guests.[6]

In its answer, the department requested a judgment declaring that the Sisters are required to obtain a sales tax permit for the sale of meals, and to pay tax on nonexempt sales. The trial court granted judgment for the department on the ground that the provision of meals by the Sisters was not "an exercise of religion" and was taxable under sec. 77.51, *et seq.*, Stats. 1977. The court of appeals held that the meals were furnished pursuant to an exercise of religion, but that they were taxable nonetheless.

Two issues are raised for our consideration on appeal:

1. Are the Sisters "retailers" as defined by sec. 77.51 (7), Stats., who are liable for the sales tax imposed by sec. 77.52? We hold they are not.

---

[6] Sister Mary David Walgenbach, Prioress, testified that they never even kept track of what "charges" should be allowed for meals until the state questioned their activity.

2. If the sales tax does apply, does imposition of liability for collection of the sales tax on the Sisters violate their right to the free exercise of their religion? In view of our answer to question one, we do not decide this issue.

As a matter of judicial prudence, a court should not decide the constitutionality of a statute unless it is essential to the determination of the case before it. *Smith v. Journal Co.*, 271 Wis. 384, 390, 73 N.W.2d 429 (1955).

As to the first issue: A tax can only be imposed by clear and express language, and all ambiguities as to the applicability of the tax must be resolved in favor of the person upon whom the tax is sought to be imposed. *Kearney & Trecker Corp. v. Dept. of Revenue*, 91 Wis. 2d 746, 753, 284 N.W.2d 61 (1979). This construction when the *applicability* of the tax is at issue contrasts with the interpretation accorded *exemptions* from taxation, wherein ambiguities are resolved against the person claiming an exemption. *Mid-Continent Broadcasting Co. v. Dept. of Revenue*, 98 Wis. 2d 379, 390, 297 N.W. 2d 191 (1980). The test of statutory ambiguity is whether the statute is capable of being construed in two different ways by reasonably well-informed persons. *Dept. of Revenue v. Milwaukee Refining Corp.*, 80 Wis. 2d 44, 49, 257 N.W.2d 855 (1977).

The Wisconsin sales tax is imposed by sec. 77.52(1), Stats., which reads:

"77.52. **Imposition of retail sales tax.** (1) For the privilege of selling, leasing or renting tangible personal property, including accessories, components, attachments, parts, supplies and materials, at retail a tax is imposed upon all *retailers* at the rate of 4% of the gross receipts from the sale, lease or rental of tangible personal property, including accessories, components, attachments,

parts, supplies and materials, *sold,* leased or rented *at retail* in this state." (Emphasis added.)

"Retailer" is defined in sec. 77.51 (7), Stats., the pertinent provisions of which read as follows:

"77.51.  **Definitions** . . . (7) 'Retailer' includes:
" (a)  Every *seller* who makes any sale of tangible personal property or taxable service. . . .
" (b)  Every *person engaged in the business of making sales* of . . . tangible personal property for storage, use or consumption or in the business of making sales at auction of tangible personal property owned by the person or others for storage, use or other consumption."   (Emphasis added.)

Section 77.51 (7) (a) defines a "retailer" as a "seller," while sub. (b) defines a retailer as a "person engaged in the business of making sales." It is clear from the record that the Sisters are engaged in a religious vocation, and are not "engaged in the business of making sales." Therefore they are not sec. 77.51 (7) (b) "retailers."

The term "seller" is defined in sec. 77.51 (9), Stats.:

"77.51.  **Definitions.** . . . (9) 'Seller' includes every person selling, leasing or renting tangible personal property or selling, performing or furnishing services of a kind the gross receipts from the sale, lease, rental, performance or furnishing of which are *required to be included in the measure of the sales tax."* (Emphasis added.)

The juxtaposition of the statutory definitions creates a circularity. Sec. 77.52 (1), Stats., imposes a tax on "retailers." "Retailers" are defined in sec. 77.51 (7) (a) as "sellers." "Sellers" are then defined in sec. 77.51 (9) as "persons" who collect receipts for an activity which is included in the measure of the sales tax pursuant to sec. 77.52 (1).

This circularity makes the scope of the statute ambiguous. One interpretation would be to read either the

word "retailer" in sec. 77.52(1), Stats., or "seller" in sec. 77.51(7)(a), as meaning "person." This would make the definition of "retailer" in sec. 77.51(7)(b) superfluous, but would be consistent with the broad interpretation of the term adopted by this court in *Recht-Goldin-Siegal Const. v. Dept. of Revenue,* 64 Wis. 2d 303, 219 N.W.2d 379 (1974).[7] Alternatively, "retailer" may mean something less than the more inclusive term "person." Such an interpretation would give meaning to sec. 77.51(7)(a) and (b).

Recourse to rules of statutory construction is appropriate in the face of a statutory ambiguity. The purpose of statutory construction is to discern the intent of the legislature. *Cross v. Soderbeck,* 94 Wis. 2d 331, 340, 288 N.W.2d 779 (1980). When construing statutes, meaning should be given to every word, clause and sentence in the statute, and a construction which would make part of the statute superfluous should be avoided wherever possible. *County of Columbia v. Bylewski,* 94 Wis. 2d 153, 164, 288 N.W.2d 129 (1980). When construing a statute, the court must consider it in relation to its scope, history, context, subject matter and object to be accomplished or remedied. *Berns v. Wisconsin Employment Relations Comm.,* 99 Wis. 2d 252, 265, 299 N.W. 2d 248 (1980). Common and approved usage of words in a statute may be established by definitions contained in a recognized dictionary. *In re Estate of Haese,* 80 Wis. 2d 285, 291, 259 N.W.2d 54 (1977). Statutes relating to the same subject matter may be considered in construing a statutory provision. *Wisconsin Bingo Sup. & Equip. Co. v. Bingo Control Bd.,* 88 Wis. 2d 293, 303, 276 N.W.2d 716 (1979).

---

[7] " 'Retailer' was always defined in the broadest terms in both the 1967 statute and the present statute. A 'retailer' under both statutes includes every seller who makes any sale of taxable tangible property." *Recht-Goldin-Siegal Const., supra,* 64 Wis. 2d at 310.

The taxability of a sale depends on the specific circumstances of the transaction to which it relates rather than of the parties to it. This is evidenced by statutory provisions such as those which absolve a retailer from the tax on sales to uncollectable accounts (sec. 77.52(6), Stats.); which exempt from sales tax up to three fundraising events a year sponsored by certain types of nonprofit organizations (secs. 77.51(10)(c); 77.54(7)); or which exempt from tax the sale of goods that are consumed in the manufacturing process (sec. 77.54(2)). Other statutes which stress the nature of the transaction include sec. 77.54(8), which exempts finance charges only if separately stated rather than included in the price of the goods sold, and sec. 77.51(11)(c)2, which taxes a gratuity if it is in the form of a set charge added on to a bill, but not if determined and left by the consumer or user of the goods or services provided.

Regulations promulgated by the department, the agency responsible for administering the sales tax, also focus on the features of the transaction to determine whether the proceeds derived from it are subject to the sales tax. Sec. TAX 11.10(4)(f), Wis. Adm. Code (1978), provides that someone who primarily makes nontaxable sales will still be responsible for the tax on those particular transactions which are not exempt, however minimal they may be in light of the seller's overall business activities. *See also,* sec. TAX 11.87(2)(b) (1978). Similarly sec. TAX 11.04, Wis. Adm. Code, (1979), exempts the sale of building materials which are made directly to tax exempt entities while taxing similar materials sold to contractors hired by such entities despite the fact that the ultimate use of the materials may be the same in both transactions (*i.e.,* as components of a church or school). A noninclusive list of other administrative code sections which focus on the specifics of the transaction are: Secs. TAX 11.09, Wis. Adm. Code, (1978), 11.45

Code (1978), taxation of medicine dependent on whether prescription or over-the-counter; sec. TAX 11.29 (1978), transaction not taxable if goods to be leased or rented rather than used or consumed; sec. TAX 11.50 (1978), exempting receipts from some types of auctions but not from others.

Prior decisions of this court have also focused on the specific circumstances of the transaction in deciding whether receipts derived therefrom are taxable. In three cases involving the sale of essentially all of the personal property of a business pursuant to a transfer of owner-ship,[8] this court held that the critical determinant of taxability was whether the seller held a seller's permit at the time the transaction was consummated. In two of the cases, *Mid-Continent, supra,* 98 Wis. 2d 379, and *Ramrod, supra,* 64 Wis. 2d 499, the seller held a permit at the time of the sale, and this court held that the transaction was taxable pursuant to secs. 77.54(7) and 77.51(10)(a), Stats., while in a third case this court held the sale to be exempt from the sales tax, despite similar facts, because the seller had surrendered its seller's permit prior to the sale, *Three Lions, supra,* 72 Wis. 2d 546.

In *Janesville Data Center v. Dept. of Revenue,* 84 Wis. 2d 341, 267 N.W.2d 656 (1978), this court held that a purveyor of keypunched cards and magnetic tapes for use in computer programs was not subject to the sales tax. The transaction involved the transfer of tangible property such as the cards and tapes. This court deter-mined that the essence of the transaction was the in-formation encoded on the cards and tapes, and then held that transaction was primarily one involving the trans-

[8] *Mid-Continent Broadcasting Co. v. Dept. of Revenue, supra,* 98 Wis. 2d 379, *Three Lions Supper Club v. Dept. of Revenue,* 72 Wis. 2d 546, 241 N.W. 2d 190 (1976); *Ramrod, Inc. v. Dept. of Revenue,* 64 Wis. 2d 499, 219 N.W.2d 604 (1974).

fer of intangible property which was outside of the scope of the sales tax statute.

Similarly, in *Dept. of Revenue v. Milwaukee Refining Corp., supra,* 80 Wis. 2d 44, this court analyzed the sale of gold alloys to dentists and determined that the nature of the transactions was not a "sale made at retail by a retailer" taxable under sec. 77.52(1), Stats. The dentist's patient, rather than the dentist, was the ultimate consumer or user of the alloy since the alloy was not withdrawn from the market until placed by the dentist in the patient's mouth. Accordingly, since the dentist was not the ultimate consumer, this court held the sales were not taxable sales at retail and ruled that the provider of the alloys was not subject to tax on these transactions. In both *Janesville Data, supra,* 84 Wis. 2d at 345–346, and *Milwaukee Refining, supra,* 80 Wis. 2d at 48–49, this court applied the rule that all ambiguities as to the scope of the taxing statute must be construed in favor of the taxpayer and against imposition of the tax.

The meaning of the word "retailer" also depends on the transaction to which it relates. For instance, sec. 77.51(7)(d), Stats., declares that a wholesaler will be deemed a retailer as to transactions made to persons other than sellers, yet be outside the scope of the term in all other cases.

Because the word "retailer" is so central to the applicability of the sales tax, and because the various definitions of the term set forth in sec. 77.51(7), Stats., obscure rather than clarify the term, recourse to dictionary definitions is an appropriate means of discerning legislative intent. *Webster's Third International Dictionary,* (unab. 1976), defines "retailer" as "one that retails something . . . specif[ically] : a merchant middleman who sells goods mainly to ultimate consumers." The same source defines "merchant" as "a buyer and seller of commodities for profit; . . . the operator of a retail business."

The common conception of a retailer, as shown by the dictionary definition, is one who transacts business with a consumer in hopes of making a profit on the transaction. Because of the statutory ambiguity, it is unclear whether this was the meaning intended by the legislature in the sales tax statute.

It is clear that nonprofit groups are not, solely by virtue of their not-for-profit nature, exempt from tax upon all sales which they make. This is evidenced by the occasional sales exemption contained in secs. 77.51(10)(c) and 77.54(7), Stats., applying to those groups. Sec. TAX 11.10, Wis. Adm. Code (1978), supports this conclusion, as does the repeal of the tax exemption for all meals served by such groups, formerly contained in sec. 77.52 (1)(a)7, Stats. 1967, when the selective sales tax was changed to general tax by chapter 154, secs. 217–279, Laws of 1969.

A nonprofit group, to finance its generally eleemosynary activities, may enter into specific transactions or undertakings with the hope of deriving a profit therefrom. These nonprofit groups may be "retailers" for the purpose of those profit seeking transactions and therefore liable for the sales tax on receipts derived therefrom unless they can claim some specific exemption from the tax. However, concluding that nonprofit groups are not exempt from the sales tax on gross receipts derived from *all* transactions which they enter into does not *ipso facto* require that such groups are liable for tax on receipts derived from *every* transaction in which they engage.

Nonprofit organizations may engage in transactions from which no profit is sought. Provision of meals on "skid row" by missions is an example of such an activity. The fact that the organization is recompensed somewhat by the beneficiaries of such activities does not change the fundamentally nonmercantile nature of the transaction. We conclude that the concept of "retailer"

embodied in the sales tax statute does not encompass such fundamentally nonmercantile transactions as were engaged in by the Sisters on the facts in this case, and that any receipts derived therefrom are outside of the scope of the sales tax statute.

The statutory interpretation by the court of appeals, which held the Sisters to be retailers because their sale of meals was excluded by sec. 77.54(20)(c)1, Stats., from the sec. 77.54(20) exemption accorded food, thereby making them sellers, is equally unsatisfactory. As a matter of statutory construction, exceptions contained in statutes should only be read to apply to the immediately preceding section unless it is clear that the legislature intended otherwise, *see, Loof v. Rural Mut. Casualty Ins. Co.,* 14 Wis. 2d 512, 516, 111 N.W.2d 583 (1961). We can find no indication that the legislature intended the sec. 77.54(20)(c)1 exception to relate to anything more than the general tax exemption accorded food contained in sec. 77.54(20). In light of the requirement that ambiguities be construed against imposition of the tax, we do not believe it appropriate to read the exception to an exemption contained in sec. 77.54 (20)(c)1 as expanding the definition of retailer contained in sec. 77.51(7).

The construction which we give to "retailer" applies the sec. 77.51(7)(b), Stats., definition to all persons "engaged in the business of making sales." Those persons are, by statute, required to pay a tax on the gross receipts of all retail sales which they enter into unless they can point to a specific exemption from the tax. Sec. 77.51(7)(a) requires persons who are not in the business of making sales to pay the sales tax if they are sellers—*i.e.,* engaging in a transaction for which the gross receipts are subject to the sales tax pursuant to sec. 77.52(1). The type of transactions which make one a sec. 77.51(7)(a) retailer are mercantile ones.

The Sisters presented extensive evidence in support of their position that the meals which they served and ate with their guests were in furtherance of their religious beliefs. Especially relevant to this determination is chapter 53 of the Rule of St. Benedict, requiring the Sisters to make all guests welcome. Uncontested testimony by the Sisters and Catholic, Protestant and Jewish religious leaders established that one of the primary missions of the sisters was to further the ecumenical movement by providing a place where persons of all religious beliefs could gather in comfortable surroundings. Furthermore, it was established that the Sisters and other religious leaders believed that furthering ecumenism required that other than religious groups be brought into the dialogue, again to help persons from diverse backgrounds reach common understandings. There was no evidence presented that controverted the well-documented contention by the Sisters that their sole motive for opening the center to other than religious groups was to advance their ecumenical ideals.

The charge of a set fee or charge for food, lodging and meeting facilities does not by itself establish that a mercantile motive underlies their provision. Testimony established that, pursuant to the Rule of St. Benedict, the Sisters provided food and lodging for guests who were unable to pay the fees. The financial records of the center reveal that it has lost money every year that it has been in operation.[9] It was uncontroverted that the

---

[9] An accountant for the center testified that the deficits for the center for a five-year period were as follows:

"1973—$17,601.44
1974—$41,566.36
1975—$25,246.43
1976—$11,672.44
1977—$34,020.66"

To make up such deficits, money is obtained from the operation of their hospital in Sioux City, Iowa, where the salaries allocated

Sisters are sincerely dedicated to the ecumenical cause and that they, as well as other religious leaders, believe that the provision of a relaxed, pastoral setting in which persons from varied backgrounds can meet, converse, and break bread together is an effective way to promote understanding among people of various callings and beliefs.

The evidence showed that less than three percent of the gross receipts for meals came from people who came to the center with business sponsored seminars. Perhaps the relatively spartan atmosphere of the center is not attractive because of the larger tax write off that business people can get for seminars held in more luxurious surroundings.

The state says in effect:

"When you serve meals to members of educational, governmental and religious groups who are your guests we do not demand the sales tax because we will assume they have an exemption from that tax to which they are entitled, but not because of what you are but because of what they are. Conversely if you serve a group of business or professional people or individuals there on retreat then you must pay a tax."

But the evidence shows that the Sisters make no such distinction. They see them all as people, people to share with, to have dialogue with in the relaxed, friendly, outgoing act of eating, talking, and perhaps praying together. Its purpose is to teach, to make others aware that what the Sisters do and why they do it, is worth thinking about, worth appreciating, worth sharing, no matter how foreign or strange to the others' experience or tradition it may be.

---

to the Sisters in the hospital budget are turned over to the Order and some of that money used here. There was also testimony that a Sister who works in a local hospital as a registered nurse turns her salary over to the Order pursuant to its rule of individual poverty.

The testimony shows that guests do respond. Some come back alone, or with their families to work, to talk, to pray.

The shared meal has been a sign of Christian fellowship since the days of the apostles.

"And day by day, attending the temple together and breaking bread in their homes, they partook of food with glad and generous hearts, praising God and having favor with all the people. And the Lord added to their number day by day those who were being saved." Acts 2:46, 47 R.S.V.

So too the Sisters of St. Benedict follow the same tradition in the same spirit and for the same hoped for results. To achieve it they follow the rule laid down by their founder over 1400 years ago.

The religious aspect of meal sharing was testified to by Rabbi Manfred Swarensky:

". . . even serving meals, which can be regarded as a secular activity, I mean, restaurants do the same thing, but it is a difference whether the Sisters do it at St. Benedict's or the Park Hotel, for instance, or any other commercial establishment. What's the difference? I don't want to really go too deeply into it, however, I feel I should say this. From the point of view of the original and traditional Christian view, serving a meal is not just a secular activity, but it's the Eucharist, communion service, and other meals, they were always regarded as a sacramental meal in the broader sense of the word; namely, there is not only the presence of the individual who participates of the meal but there also is a visible or invisible presence of God that even goes back to the Ancient Greeks. It is for the purpose of renewing the kinship among the people who attend, the human kinship, and also renewing or reviving their relationship of the individual to God. This is the way a meal has been seen in the context of Christianity of ancient times. Now it has petered out a little bit in our secular thinking, but I do believe that a certain amount of that spirit which I briefly described still exists and does obtain also at the Center here. . . ."

Preparing, serving and sharing the meals here in question is as much a religious act as praying and equally untaxable. The complete lack of mercantilism in the activities shown in this record separates the Sisters from any definition of "retailer" contemplated by our sales tax statute.

What the record makes clear is that serving meals is not a means of *supporting* their ministry; it *is* an integral part of their ministry.

This is in contrast to meal service as a mere fund raiser to support other charitable or religious activities that everyone is familiar with.

The state put in evidence the testimony of a state employee who had arranged for training classes for certain state employees at the center. He testified that the price was attractive, the center was relatively close to the state office building and provided adequate facilities for his department's purposes. He testified the Sisters either gave a talk or showed a film about the center explaining the work of the center and invited them to the religious services. Similar testimony had been given several times by witnesses for the Sisters. He then testified that he didn't attend any of the religious services at any of the times he was there. Apparently the state's purpose in the latter statement was to show that the whole set up had no religious purpose as far as he was concerned and that to him at least it was merely a cheap and convenient accommodation for a department training session.

Undoubtedly, there have been those who have entered the Cathedral at Chartres only to get out of the rain. But such an act cannot detract from its beauty or change the noble purpose for which it was built.

We conclude the meals served by the Sisters under the circumstances shown in this record are not subject to the sales tax.

*By the Court.*—Judgment reversed and cause remanded with directions that the circuit court enter judgment declaring that plaintiffs are not liable for sales tax for meals served at the center and they they are not required to obtain a seller's permit.

COFFEY, J. *(concurring).* I concur in the opinion of the majority and offer the following analysis of the sales tax provisions applicable to this case only to further demonstrate that the Wisconsin sales tax was not intended to apply to activities like those of the Sisters of St. Benedict involved in this case.

There is a significant paradox in the analysis upon which the litigants and the lower courts below have proceeded in this case. Nowhere in the record has it been made to appear whether the undifferentiated charges made by the petitioners for rooms and meals and use of the facilities were assessed against the various sponsoring organizations or against the individual participants in their respective meetings. It appears (pet. appen. at 305) that the rates were calculated only on a per capita basis; and that the use of the petitioners' facilities was for the purpose of conducting group meetings and meals were provided without an additional charge. But even so, regardless of this assumption, it seems clear that the sponsoring associations were not, as such, the ultimate consumers of the meals provided. Therefore, either the sales in question were made to the individual participants (perhaps through the agency of the participants), or they were made to the sponsoring organizations and resold, or otherwise transferred or assigned by the sponsoring organizations to the individual participants.

The difference is an important one. If the buyer-seller relationship was of the first kind, the involvement and exempt or nonexempt status of the sponsoring group is immaterial. The issue becomes squarely one of whether any regular provision of meals for a charge, even in-

cidental to a purely religious retreat or conference privately convened by a few families, subjects the petitioners to sales tax liability.

If, however, the relationship was of the second type, it is apparent that the meals were intended for resale by the sponsoring groups, and thus, could not constitute "sales at retail" or "gross income from retail sales," regardless of whether or not the sponsoring group was also exempt under *e.g.*, sec. 77.54(9a). Sales to such exempt groups may, nevertheless, arguably be taxable against the petitioners by virtue of sec. 77.51(4)(b), assuming that such groups in fact transfer the meals to the individual participants "without valuable consideration." However, since business meetings most frequently include agents and employees of a particular entity, whose contracts of employment would in all probability of themselves provide the requisite consideration, the business organization is receiving compensation in return for the meals, regardless of whether money actually changes hands.

Since it is evident in this case that the petitioners have neither sought nor obtained certificates of exemption from any of the individuals or organizations to whom they have offered and supplied meals, a procedural presumption may arise that none of the sales are exempt either as a sale for resale or as a sale to an exempt governmental, educational, scientific or research organization. But, the position taken by the respondent in this litigation—that the petitioners are liable only for those meals sold to (or for) business organizations—is inconsistent with any such hypothesis. (Res. br. at 4). Most of the meals currently "sold" by the plaintiffs are meals bought by governmental, charitable or religious organizations whose purchases are exempted by sec. 77.52(9)(a), Stats. The tax at issue here is only on sale *to* nonexempt groups.

This is an anomalous concession, indeed, for it is obvious that meals are not consumed by corporations or as-

sociations of any kind, but only by individuals. If the sales in question were, in fact, to corporations and associations, it is clear that the sales in question were not "sales at retail," and, hence, are necessarily exempted from "gross income" under the sales tax act. The petitioners would not, in that event, have been a "seller" under sec. 77.51(9) and, therefore, because they were not a seller, they could not have become a "retailer" under sec. 77.51(7)(a). Nor, as the parties and both lower courts appear to concede, could they have been considered a retailer under sec. 77.51(7)(b), because it seems to be clearly established in the appellate court decision "that the Sisters were at no time engaged in a commercial enterprise such as furnishing meals to business groups."

Whatever degree of dissent may arise respecting this conclusion of the court of appeals, as addressed to the participants in various business meetings, I know of no logical reason to believe that individuals, who simply partake of meals incidental to their participation in a privately arranged religious exercise, in the physical environment of a monastery, as selected and invited guests of a religious order, can translate or transpose that activity into a taxable sale simply by making a trifling contribution or payment. Even without considering the express protection afforded to religious exercises under the First Amendment, it seems clear beyond any reasonable question that the enjoyment of a simple meal with a family and guest falls within the scope or zone of essential privacy which the state must not infringe or enter upon.

But for the presence of sec. 77.51(10)(a), the general sales tax statute would operate to make every head of a household accountable to the Department of Revenue as a "seller" and "retailer" whenever he or she, as an incident to the service of a meal, received anything of value, including any fees, service charge, labor charge or other

addition added to the price charged a customer by a retailer, which represents or is in lieu of a tip or a gratuity (sec. 77.51(11)). Children or adults could not be required or permitted to "earn their keep" by helping with kitchen or household chores, or to contribute to family support out of their own personal earnings, without exposing their parents to the possible criminal misdemeanor (sec. 77.52 (12)) of failure to obtain a retailer's permit, or to comply with any other of the commercially oriented accounting procedures of the act. Logically, the same reasoning would necessarily apply to any invited guest whose contribution to a private meal was expected or accepted. The institution of quarterly or monthly social bridge, gin rummy or cribbage clubs and "pot luck" dinners and picnics would thus be immersed in and inundated with a sea of revenue regulations.

There can be no doubt that the legislature, in enacting sec. 77.51(10) (a), was alert to the obvious institutional shoals, as well as the obvious practical absurdity, of so wanton an invasion of the fundamental rights of familial privacy. However, the court of appeals, squarely faced with the question of whether that saving provision was available to any "neighborhood association, civic group, garden club, social club, or similar organization" in light of sub. (10) (c), ruled that all such organizations were confined to the narrow stricture of that section in exercising whatever degree of privacy was circumstantially due them. I disagree. In my view, sub. (10) (c) creates an *a priori* presumption of nontaxability in favor of the named organizations within the bounds of the activity described, "Three events, seven days." This is true whether the number of taxable "admissions or tickets" within those days is ten or ten thousand. The subsection, in my opinion, does not apply to occupational and private sellers, a distinction which para. (a) was designed to preserve. The construction adopted by the court of appeals would operate to discriminate against pri-

vate and religious groups, reversing the constitutional priorities.

Further, there is an additional ground or reason for holding that the protections of para. (a) are available to these petitioners, uninhibited by the limitations of para. (c). Neither a religious person, nor a group of religious people, residing together in a religious community under the strict discipline and control of their respective order, can properly be called a "church" or "similar organization." Their privately held and operated living and dining facilities and activities are not, as the record demonstrates, open to the public or to all who seek entry, even for religious purposes. The petitioners' facility is unambiguously and accurately described as a "monastery," the function of which is radically different from that of a church. A church is designed to accommodate the religious needs of a wide range of people known as parishoners, some formally registered and active in the church's activities as such and some episodic. A monastery, in contrast, is the primary place of residence, worship, contemplation and service of a closed group of religious people joined in a brotherhood or sisterhood, frequently even cloistered, separated and apart from the outside world. While monasteries are members of churches, and share the evangelistic and theological doctrine of their faith, the two are very distinct, separate and different kinds of institutions with respect, most importantly, to their *privacy*.

If these monasteries were to operate a public restaurant facility outside their monastic setting and offer and serve meals and lodging to whomever chose to enter, a far different question would be presented to the court than the facts set forth in the sketchy record. There is no question, however, that no such circumstances are presented herein. The record is void of any showing that anyone entered upon the monastery premises to

break bread, secure lodging, or participate in intellectual and ecumenical discussions at the dining table with the sisters, except upon prior invitation (expressly designating them as guests) at a monastery meal. Nor under the strict and unbending rules of the Order, could anyone do so. Thus, to enforce the ruling of the court of appeals would go beyond the mandates of the revenue code and significantly invade the sisters' reasonable and well-established expectation of privacy, contrary to the dictates of law.

SHIRLEY S. ABRAHAMSON, J. *(dissenting)*. Although I may think it unwise to impose a sales tax on the Sisters, the question of who should be taxed is one for the legislature, not for the courts. The issue before this court is whether under the present statutes the Sisters are taxable.

The majority interprets the statutes as requiring two types of persons to pay a tax on the gross receipts of nonexempt retail sales: Those "engaged in the business of making sales" (sec. 77.51(7)(b), Stats.) and those "who are not in the business of making sales" but are engaged in "mercantile" transactions. (Sec. 77.51(7) (a)) *Supra,* p. 568. The majority does not define what it means by "mercantile transactions." Nor does the majority tell us how a person "engaged in the business of making sales" differs from a seller engaged in "mercantile transactions." Without defining the terms, the majority cannot explain why the Sisters are not included within at least one of these terms. For these reasons, I find the majority opinion unpersuasive.

I would affirm the decision of the court of appeals holding that, although the Sisters' work is religiously rather than commercially motivated, the sales of meals by the Sisters fall within the tax statutes and the tax is not unconstitutional.