(T.C. No. 750-002) Phyllis Ann BROWNE, Dorothy Ackerman, Oreba Alexander, Sheri L. Bartoli, Betty C. Bassett, Joanne Beck, Joann M. Behling, Jeanette A. Bennett, Donna J. Borowski, Ruth Buenger, Ruth Burba, Ivona M. Bureta, Therese Burger, Judith Campeau, Rosalie J. Cherrone, Margaret Cieszynski, Yetta Dietch, LaVerne Dugan, Beverly Engelland, Dorothy H. Gaus, Doris A. Gohlke, Judith D. Goss, Beverly A. Gray, Corinne T. Gross, Katherine L. Hanna, Mary J. Hanson, Nora R. Herriges, Donna J. Holstein, Mildred L. Hudson, Noreen M. Jacobi, Inez L. Kiles, Joyce Knippel, Linda Koebert, Hermine A. Kunda, Virginia Lemberger, Evelyn E. Markowski, Florence Markwiese, Mary Marinetto, Helen Marx, Barbara A. Morbeck, Christine M. Musial, Christine R. Nault, Esther Palsgrove, Eleanore Peliska, Faye M. Pohl, Josephine Pon, Lorraine Richardson, Annie L. Riley, Sandra Schueller, Esther L. Schueneman, Virginia A. Schwerm, Rosemarie Schwertfeger, Dorothy Strauss, Deborah J. Strelecki, Ninette Sunn, Lorraine Teske, Grace G. Voelz, Irene B. Wagner, Audrey A. Wickert, Dorothy E. Wilkes, Dorothy A. Koch, Walter J. Johnson, Edward L. Barlow, Erna Byrne, Lynn M. Kozlowski, Cherry Ann Lackey, Gerald Leranth, Irving E. Nicolai, Doris M. Piper, Christina Pitts, Mildred Pizzino, Helen Ryznar, Marshall M. Scott, John P. Skocir, Anne C. Tebo, Oliver J. Waldschmidt, Annabelle Wolter, Barbara Barrish, Doris M. Conner, Terese G. Fabian, Kathleen S. Fleury, Mary E. Jaeger, Regina S. Karpowitz, Carolyn Lohmiller, Kenneth E. Multhauf, Mildred Noffz, Teresa Patzke, Carol S. Peters, Dorothy E. Riedel, Cynthia

79

Schneider, Ruth Cheryl Thompson, Ione Trachsel and Dolores V. Winter, Petitioners-Appellants,

v.

WISCONSIN EMPLOYMENT RELATIONS COMMISSION, Respondent.

The AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL–CIO, DISTRICT COUNCIL 48, American Federation of State, County and Municipal Employees, AFL–CIO, Joh Parr, Director of District Council 48, Local 1053, American Federation of State, County and Municipal Employees, AFL–CIO, Margaret Silkey, as President of Local 1053, Florence Tefelske, as Treasurer of Local 1053, Local 594, AFSCME, affiliated with District Council 48, Local 645, AFSCME, Local 882, AFSCME, Local 1055, AFSCME, Local 1654, AFSCME, Local 1656, AFSCME, all affiliated with District Council 48, Petitioners-Appellants,†

v.

WISCONSIN EMPLOYMENT RELATIONS COMMISSION, Respondent.

Supreme Court

*No. 89-1094. Oral argument March 23, 1992.—Decided June 18, 1992.*

(Also reported in 485 N.W.2d 376.)

†Motion for reconsideration denied on August 11, 1992.

84

90

For the petitioner-appellant there were briefs by *Charles P. Stevens* and *Lindner & Marsack, S.C.,* Milwaukee and *Raymond J. LaJeunesse, Jr.* and *Milton L. Chappell* and *The National Right to Work Legal Defense*

*Foundation, Inc.,* Springfield, Virginia and oral argument by *Mr. Stevens* and *Mr. LaJeunesse.*

For the respondent the cause was argued by *John D. Niemisto,* assistant attorney general, with whom on the brief was *James E. Doyle.*

For the intervenor-respondents there was a brief by *Larry P. Weinberg* and *Robert D. Lenhard,* Washington, D.C. and *John H. Bowers* and *Lawton & Cates, S.C.,* Madison and oral argument by *Mr. Weinberg* and *Mr. Bowers.*

Amicus curiae briefs were filed by *Pamela Jacobs* and *Bruce Meredith,* Madison for the Wisconsin Education Association Council.

HEFFERNAN, CHIEF JUSTICE. This is a consolidated appeal on certification of the court of appeals from a judgment of the circuit court for Milwaukee County, Michael P. Sullivan, Circuit Judge, affirming on review pursuant to ch. 227, Stats., a final decision of the Wisconsin Employment Relations Commission (WERC) regarding constitutional and statutory claims arising out of fair-share agreements between the Milwaukee Board of School Directors, Milwaukee County and various local affiliated unions of Milwaukee District Council 48 (Council 48) of the American Federation of State, County and Municipal Employees (AFSCME). WERC concluded that the unions committed prohibited practices under sec. 111.70(3)(b), Stats., by deducting fair-share fees without first providing all of the procedural safeguards required by *Chicago Teachers Union Local No. 1 v. Hudson,* 475 U.S. 292 (1986), and ordered a variety of retrospective and prospective relief. The circuit court upheld WERC's decision in its entirety.

The facts are undisputed. In the early 1970's, the Milwaukee Board of School Directors and Milwaukee

County (the employers) entered into fair-share agreements with Council 48 and its affiliated locals (collectively, the unions), as authorized by sec. 111.70(1)(f) and (2), Stats.[1] The fair-share agreements required nonunion employees in the bargaining units represented by the unions to pay a proportionate share of the cost of collective bargaining and contract administration. The fair-share fee was equal to the dues paid by union members.

Two groups of nonunion employees filed actions challenging the constitutionality of sec. 111.70(1)(f) and (2), Stats.[2] This court held the statute constitutional in *Browne v. Milwaukee Bd. of School Directors,* 83 Wis. 2d 316, 265 N.W.2d 559 (1978) *(Browne II).*[3] Additional

[1] Section 111.70(1)(f), Stats., provides:

"Fair-share agreement" means an agreement between a municipal employer and a labor organization under which all or any of the employes in the collective bargaining unit are required to pay their proportionate share of the cost of the collective bargaining process and contract administration measured by the amount of dues uniformly required of all members. Such an agreement shall contain a provision requiring the employer to deduct the amount of dues as certified by the labor organization from the earnings of the employes affected by said agreement and to pay the amount so deducted to the labor organization.

Section 111.70(2), Stats., provides in relevant part:

Municipal employes shall have the right of self-organization, and the right to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection, and such employes shall have the right to refrain from any and all such activities except that employes may be required to pay dues in the manner provided in a fair-share agreement.

[2] *Browne v. Milwaukee Bd. of School Directors,* No. 410584 (Milw. Cir. Ct., filed May 29, 1973); and *Johnson v. County of Milwaukee,* No. 411578 (Milw. Cir. Ct., filed July 10, 1973).

[3] At an earlier stage of this action, this court affirmed an

facts in respect to this case appear in *Browne II.* The cases were ultimately remanded by the circuit court to WERC to make findings of fact and conclusions of law regarding what portion of the fair-share fees had been used for purposes unrelated to collective bargaining or contract administration.

On March 4, 1986, the United States Supreme Court decided *Hudson,* which set forth certain procedural safeguards necessary for the collection of fair-share fees:

> [T]he constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending.

*Hudson,* 475 U.S. at 310. In response to *Hudson,* the unions published a "NOTICE TO ALL NONMEMBER FAIRSHARE PAYORS," which purported to provide nonunion employees an explanation of the basis for the fair-share fee, give them an opportunity to object to the use of the fees for nonchargeable activities, and provide a mechanism by which objecting nonunion employees could challenge the unions' calculation of the fee before an impartial decisionmaker.

The notice first breaks down the unions' activities into 38 separate categories and indicates which categories the unions consider "chargeable" and which catego-

order of the circuit court overruling the demurrer of the unions to the original complaint. *Browne v. Milwaukee Bd. of School Directors,* 69 Wis. 2d 169, 230 N.W.2d 704 (1975) *(Browne I).* That decision has no effect on the present case.

ries the unions consider "nonchargeable."[4] The notice then lists 18 of the major categories of AFSCME's audited expenses, and the portion of each which AFSCME determined to be chargeable. Next, the notice provides a detailed summary of Council 48's activities and expenses, and states the percentage of which it determined were chargeable. The notice states that the general expenses of both AFSCME and Council 48 were audited.

Under the heading "AFSCME Council 48 Affiliated Locals Financial Information," the notice provides that "Council 48 has determined that the percentage of chargeable activities of these local unions is at least as great as the percentage of chargeable activities of Council 48." The notice does not indicate the basis for this "local presumption," and does not indicate whether the local unions' expenses were audited.

Next, the notice provides a procedure whereby non-union employees, within 30 days of the notice, can object to the unions' use of fair-share fees for nonchargeable activities, at which point those employees receive an advance rebate of the portion of the fees which the unions determined to be nonchargeable. The notice then provides a procedure for objecting employees to challenge the unions' calculation of the nonchargeable amount. "Challengers" must inform the unions in writing of their intent to challenge the calculation, at which point the unions will place in escrow 100 percent of the

---

[4]For example, the unions list as chargeable "[g]athering information in preparation for the negotiation of collective bargaining agreements," and list as nonchargeable "[s]upporting and contributing to charitable organizations, political organizations and candidates for public office, ideological causes and international affairs."

fair-share fees collected from the challengers.[5] All challenges are consolidated into a single hearing before an impartial arbitrator, at which the unions bear the burden of proof for the accuracy of the calculation. The escrowed amounts are disbursed pursuant to and in accordance with the arbitrator's decision.

In April, 1986, the nonunion employees requested WERC to review the fair-share agreements in light of *Hudson.* On May 9, 1986, WERC issued an order to show cause and notice of hearing in both *Browne* and *Johnson,* and consolidated the cases. On May 30, 1986, WERC held a hearing. On April 24, 1987, WERC issued an extensive decision, determining that the unions had committed prohibited practices under sec. 111.70(3)(b), Stats., by providing only some of the procedural safeguards required by *Hudson,* and ordered extensive retrospective and prospective relief.

WERC held that the unions' notice and procedures were legally deficient in several aspects and legally sufficient in several others, and that the *Hudson* holding is to be retroactively applied. WERC ordered the union to: (1) refund to the complainants, at percentages established in the various stipulations, all nonchargeable fair-share fees collected prior to December 31, 1982, with interest;[6] (2) escrow an amount equal to all fair-share fees deducted from the complainants between January 1, 1983 to March 4, 1986 (the date *Hudson* was decided), with

─────────────

[5]We refer throughout the opinion to both "objectors" and "challengers." Objectors (also referred to by various courts as "dissenters") are those nonunion employees who object to the union's use of their funds for nonchargeable activities. Challengers are those objecting nonunion employees who go on to challenge the unions' calculation of the nonchargeable amount.

[6]The parties stipulated to the nonchargeable amounts for all fair-share fees collected prior to January 1, 1983.

interest; (3) rectify the deficiencies in the notice to comply with *Hudson;* and (4) continue the present advance rebate, and escrow all fair-share fees deducted after March 4, 1986 from all fair-share fee payors, plus interest. WERC also held that the escrow amounts must be in the control of a neutral third party, and that the escrowed amounts would be disbursed in accordance with the approved *Hudson* procedures. ·

The unions and the nonunion employees both sought review of portions of WERC's decision pursuant to sec. 227.52, *et seq.,* Stats. On March 16, 1989, the circuit court upheld WERC's decision in its entirety. Both parties appealed the circuit court's judgment to the court of appeals. Pursuant to sec. (Rule) 809.61, Stats., the court of appeals certified the consolidated appeal to this court. We granted certification on April 3, 1990. On September 18, 1990, we granted the parties' motion to hold this case in abeyance pending the decision of the United States Supreme Court in *Lehnert v. Ferris Faculty Ass'n,* — U.S. —, 111 S. Ct. 1950 (1991). *Lehnert* was decided on May 30, 1991.

The nonunion employees, represented by the National Right to Work Legal Defense Foundation (Right to Work Foundation), raise the following issues: (1) whether the costs of public advertising, lobbying, representation of other bargaining units, litigation or organizing are chargeable in light of *Lehnert;* (2) whether AFSCME's advance disclosure procedure, the objection requirement, and the limited scope of the arbitrator's decision meet the requirements of *Hudson;* (3) whether the employers committed a prohibited practice by deducting fair share fees without ensuring compliance with the procedures mandated in *Hudson;* (4) whether restitution and a cease-and-desist order would have been

appropriate; and (5) whether full union dues may be deducted from nonunion employees.

The unions' appeal raises the following issues: (1) whether *Hudson* applies retroactively; (2) whether 100 percent escrow of all fair-share fees of all nonunion employees is an appropriate remedy; (3) whether WERC properly vacated the arbitrator's decision; (4) whether an independent and separate audit of local unions is required by *Hudson;* and (5) whether the escrow must be under the control of a neutral third party.

We first examine the chargeability of the costs of various types of activities in light of *Lehnert.* Second, we consider whether the unions' notice provides the procedural safeguards required by *Hudson.* Third, we consider whether the employers committed a prohibited practice in this case. Finally, we examine the propriety of the relief ordered by WERC.

## I.

An initial consideration in this case is the proper deference due the WERC decision. The Right to Work Foundation argues that because WERC was merely applying the law to issues of first impression, this court should accord the agency's interpretation only "due weight." *Berns v. WERC,* 99 Wis. 2d 252, 261, 299 N.W.2d 248 (1980). WERC asserts that its decision in this case represents an interpretation of the Municipal Employment Relations Act (MERA), secs. 111.70 to 111.77, Stats., an area "in which an agency has particular competence or expertise," and that its interpretation should be given substantial deference. *Milwaukee v. WERC,* 43 Wis. 2d 596, 600, 168 N.W.2d 809 (1969). Additionally, WERC emphasizes its "generalized expertise" in public sector collective bargaining and statutory

application, and the fact that it is a policymaking body.[7]

Depending upon the nature of the issues and facts, we accord an agency's determinations great weight, due weight, or no weight at all. *Sauk County v. WERC,* 165 Wis. 2d 406, 413-14, 477 N.W.2d 267 (1991). In *West Bend Education Ass'n v. WERC,* 121 Wis. 2d 1, 12, 357 N.W.2d 534 (1984), we explained the "great weight" standard:

> [I]f the administrative agency's experience, technical competence, and specialized knowledge aid the agency in its interpretation and application of the statute, the agency's conclusions are entitled to deference by the court. Where a legal question is intertwined with factual determinations or with value or policy determinations or where an agency's interpretation and application of the law is of long standing, a court should defer to the agency which has primary responsibility for determination of fact and policy. [Footnote omitted.]

In *Berns,* we stated that "where the question involved is 'very nearly [one of] first impression,' we do not use the 'great weight' standard but, instead, accord to the interpretation due weight in determining what the appropriate construction should be." *Berns,* 99 Wis. 2d at 261 (citations omitted). In *Local No. 695 v. LIRC,* 154 Wis. 2d 75, 84, 452 N.W.2d 368 (1990), we further stated that "[w]here a legal question is concerned and there is no evidence of any special expertise or experience, the weight to be afforded an agency interpretation is no weight at all."

---

[7]*See Jordi v. Sauk Prairie School Bd.,* 651 F. Supp. 1566, 1579 (W.D. Wis. 1987) ("[WERC] is in the process of developing Wisconsin policy on fair share agreements in light of the United States Supreme Court's decision in *Hudson.*").

To the extent that WERC's decision involved the application of the principles of *Hudson* to the specific context of collective bargaining and fair-share agreements under the MERA, we accord WERC's decision great weight because of its expertise in these aspects of public sector collective bargaining arena. Additionally, the application of constitutional principles to specific facts in the public sector collective bargaining arena involves public policy considerations, which WERC is specifically authorized to make. Section 227.10(1), Stats. For example, WERC was required to fashion an appropriate remedy for fair-share fee related prohibited practices, an area in which it has substantial expertise and which involves policy considerations.

Certain questions presented by this case, such as whether the unions' disclosure satisfied *Hudson,* are matters of very nearly first impression, and we accord WERC's determinations due weight. To the extent that WERC's decision involved purely constitutional and legal questions of first impression, such as whether *Hudson* applies retroactively or whether a "local presumption" may satisfy the *Hudson* requirements, we accord WERC's decision no weight.

## II.

Consideration of the issues presented by this appeal must begin with a review of several United States Supreme Court decisions regarding fair-share fees. The cases include *Railway Employees' Dept. v. Hanson,* 351 U.S. 225 (1956); *Machinists v. Street,* 367 U.S. 740 (1961); *Abood v. Detroit Bd. of Education,* 431 U.S. 209 (1977); *Chicago Teachers Union v. Hudson,* 475 U.S.

292 (1986); *Ellis v. Railway Clerks,* 466 U.S. 435 (1984); and *Lehnert v. Ferris Faculty Ass'n,* — U.S. —, 111 S. Ct. 1950 (1991).

In *Hanson,* the Court upheld the constitutionality of a union shop agreement between a railroad and several unions. Under the union shop agreement, authorized by sec. 2, Eleventh of the Railway Labor Act (RLA), 45 U.S.C. sec. 152, all railroad employees, as a condition of continued employment, were required to become union members. Employees of the railroad challenged the provision as violative of their rights under the First and Fifth Amendments. The Court upheld the union shop agreement, reasoning that Congress's determination that it would promote labor peace to require all employees benefitting from union representation to share the costs of such representation was certainly allowable. *Hanson,* 351 U.S. at 233-35. While the record in *Hanson* contained no evidence that union dues were used for ideological purposes, the Court noted that "[i]f 'assessments' are in fact imposed for purposes not germane to collective bargaining, a different problem would be presented." *Id.* at 235.

In *Street,* the union shop provision of the RLA was again challenged. Unlike *Hanson,* however, the record in *Street* indicated that union dues were in fact used to support political causes. Construing the RLA to avoid constitutional infirmity, the Court held that the union shop provision authorized compulsory union membership only "to share the costs of negotiating and administering collective agreements, and the costs of the adjustment and settlement of disputes," and not "to provide the unions with a means for forcing employees, over their objection, to support political causes which they oppose." *Street,* 367 U.S. at 764. Thus, the court held

that the use of union dues for political causes, over an employee's objection, violated the RLA. *Id.* at 768-69.

In *Abood,* the Court considered for the first time the constitutionality of a state statute authorizing a union shop arrangement in the public sector. The Michigan statute allowed public sector unions to charge nonunion employees a "service fee" equal in amount to union dues. Abood and other nonunion employees challenged the union shop provision as a violation of their freedom of association under the First and Fourteenth Amendments. The Court recognized that compelled support of a union interferes with a nonunion employee's "freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit." *Abood,* 431 U.S. at 222. However, the Court held that pursuant to *Hanson* and *Street,* such interference is constitutionally justified by the legislative determination that a union shop is an important component in the structure of labor relations. The Court held that "[t]he desirability of labor peace is no less important in the public sector, nor is the risk of 'free riders' any smaller" than in the private sector. *Id.* at 224.

However, the Court limited the purposes for which compelled union fees from an objecting nonunion employee could be constitutionally used:

> We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative. Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment.

*Id.* at 235–36. The Court noted that the line between chargeable and nonchargeable activities was "somewhat hazier" in the public sector than the private sector, but because there was no evidentiary record in the case, the Court declined to "try to define such a dividing line." *Id.* at 236.

The dividing line between chargeable and nonchargeable expenditures in the private sector was considered in *Ellis.* The Court, again applying the union shop provision of the RLA, considered among other issues the chargeability of extra-unit litigation[8] and organizing efforts. The Court applied two tests to the expenditures: first, whether they were "necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues," *Ellis,* 466 U.S. at 448; and second, whether they "involve additional interference with the First Amendment interests of objecting employees, and, if so, whether they are nonetheless. adequately supported by a governmental interest." *Id.* at 456. The Court held that both extra-unit litigation expenses and organizing expenses failed the first test—neither was sufficiently related to the unions' duties as exclusive bargaining representative to be chargeable. *Id.* at 451–53.

In *Hudson,* the Court considered a question expressly left open in *Abood*—what procedural safeguards are necessary to " 'prevent[ ] compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities.' " *Hudson,* 475 U.S. at 302, *citing*

---

[8] "Extra-unit litigation" refers to litigation not having any connection with the particular bargaining unit. *Ellis,* 466 U.S. at 453.

*Abood,* 431 U.S. at 237. The procedure at issue in *Hudson* involved an automatic advance rebate to all nonunion employees of the amount the union determined to be nonchargeable, and a challenge procedure whereby nonunion employees could dispute the unions' computation of the nonchargeable amount. Applying the reasoning of its previous union shop decisions, the Court held:

> [T]he constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending.

*Id.* at 310. The Court stated that the nonunion employee had the burden of objecting to the amount of the fee, but that the union must first provide adequate information regarding the basis of the fee to allow the nonunion members to object to it intelligently. *Id.* at 306. Because the union procedure before the Court involved an advance rebate of the nonchargeable fees to all nonunion employees, the Court did not comment on the nonunion employee's burden of objecting in the first instance to the use of agency dues for nonchargeable purposes.

Finally, in *Lehnert,* the Court considered the question expressly left open in *Abood*—what is the dividing line between chargeable and nonchargeable union activities in the public sector. The majority of the Court set forth the following test:

> [C]hargeable activities must (1) be "germane" to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding "free riders"; and (3) not significantly add

104

to the burdening of free speech that is inherent in the allowance of an agency or union shop.

*Lehnert,* — U.S. at —, 111 S. Ct. at 1959. Justice Scalia, joined by three other Justices, stated that he would hold chargeable only "the costs of performing the union's statutory duties as exclusive bargaining agent." *Id.* at —, 111 S. Ct. at 1975 (Scalia, J., concurring in part and dissenting in part). As discussed below, the Court's application of the test to the various categories of expenses offers general guidelines to lower courts in determining the chargeability of public sector union activities.

## III.

The first issue we consider is the chargeability to nonunion employees of union expenses for public advertising, lobbying, exclusive representation of other bargaining units, litigation and organizing. In *Lehnert,* the United States Supreme Court specifically considered four of the five categories of expenses at issue in this case. Because *Lehnert* was decided after WERC's decision, WERC's conclusions regarding chargeability merit no deference. *Lehnert* makes clear that the determination of chargeability is a constitutional determination. *Lehnert,* — U.S. at —, 111 S. Ct. at 1959; *Hohe v. Casey,* No. 91-5002, (3rd Cir. Feb. 10, 1992), slip op. at 20. This court owes no deference to WERC regarding constitutional questions of first impression. *Local No. 695,* 154 Wis. 2d at 84.

## A.

The unions' notice listed as chargeable "[t]he public advertising of positions on the negotiation of, or provi-

105

sions in, collective bargaining agreements, as well as on matters relating to the representational interest in the collective bargaining process and contract administration." WERC held that expenditures for public advertising "on matters relating to the representational interest in the collective bargaining process and contract administration" were chargeable.

In *Lehnert,* the Court stated:

> The Court of Appeals determined that the union constitutionally could charge petitioners for certain public-relations expenditures. In this connection, the court said: "Public relations expenditures designed to enhance the reputation of the teaching profession . . . are, in our opinion, sufficiently related to the unions' duty to represent bargaining unit employees effectively so as to be chargeable to dissenters." 881 F.2d, at 1394. We disagree. Like the challenged lobbying conduct, the public-relations activities at issue here entailed speech of a political nature in a public forum. More important, public speech in support of the teaching profession generally is not sufficiently related to the union's collective-bargaining functions to justify compelling dissenting employees to support it.

*Lehnert,* — U.S. at —, 111 S. Ct. at 1964. Justice Scalia agreed that public relations expenses are nonchargeable because they are not "part of this collective bargaining process." *Id.* at —, 111 S. Ct. at 1979–80.

The unions and WERC urge that we read *Lehnert* narrowly and hold that public advertising specifically related to collective bargaining or contract administration is chargeable. They argue that public advertising is an important negotiating tool in the public sector. We agree, and affirm WERC's conclusion that costs for pub-

lic advertising related to collective bargaining or con-
tract administration are chargeable. Unlike the public
relations expenses at issue in *Lehnert,* such public adver-
tising expenses by definition are related to the unions'
collective bargaining function. *See Reese v. City of
Columbus,* No. C2-92-268 (S.D. Ohio May 7, 1992), slip
op. at 12–13.

### B.

WERC held that lobbying "for collective bargaining
legislation or regulations or to effect changes therein" or
"for legislation or regulations affecting wages, hours and
working conditions of employes generally before Con-
gress, state legislatures, and state and federal agencies"
is chargeable, but that lobbying for "political, charitable,
and ideological matters" is not chargeable.

In *Lehnert,* Justice Blackmun stated:

> [W]e hold that the state constitutionally may not
> compel its employees to subsidize legislative lobbying
> or other political union activities outside the limited
> context of contract ratification or implementation.

*Lehnert,* — U.S. at —, 111 S. Ct. at 1960–61. Justice
Blackmun explained that "[t]here is no question as to
the expressive and ideological content of these activi-
ties," and therefore there is a significant possibility of
interference with the dissenting employees' First
Amendment interests. *Id.* at —, 111 S. Ct. at 1960. Jus-
tice Scalia concurred in the result because he concluded
that lobbying expenses are not "part of this collective
bargaining process." *Id.* at —, 111 S. Ct. at 1979–80
(Scalia, J., concurring in part and dissenting in part).

■

Thus, in accordance with *Lehnert,* we hold that
expenses for lobbying activities are chargeable if the lob-

bying is related to contract ratification or implementation.

## C.

WERC held that the costs of representing other bargaining units are chargeable. WERC reasoned that the wages, hours and working conditions of other units "impact on the results obtained in collective bargaining for the employes in [the] unit involved herein." These costs arise in the context of the local unions' affiliation fees to Council 48 and AFSCME.

In *Lehnert,* Justice Blackmun concluded that "a local bargaining representative may charge objecting employees for their pro rata share of the costs associated with otherwise chargeable activities of its state and national affiliates, even if those activities were not performed for the direct benefit of the objecting employees' bargaining unit." *Lehnert,* — U.S. at —, 111 S. Ct. at 1961. In this context, Justice Blackmun noted that "[t]he essence of the affiliation relationship is the notion that the parent will bring to bear its often considerable economic, political, and informational resources when the local is in need of them." *Id.* at —, 111 S. Ct. at 1961. Thus the Court concluded that such costs are chargeable so long as they "may ultimately enure to the benefit of the members of the local union by virtue of their membership in the parent organization." *Id.* at —, 111 S. Ct. at 1961–62. Justice Scalia concurred in this holding. *Id.* at —, 111 S. Ct. at 1980–81 (Scalia, J., concurring in part and dissenting in part).

Because WERC has expertise in determining whether the costs of certain activities enure to the benefit of the local unions, we give WERC's conclusion great

weight and affirm its decision that such costs benefit the local unions and are chargeable.

### D.

WERC held that jurisdictional dispute proceedings, impasse mechanisms, and litigation "relating to concerted activity and collective bargaining" are chargeable, even if the nonunion employees' units are not involved. In *Lehnert,* Justice Blackmun stated that where union litigation is "unrelated to an objecting employee's unit," it is "not germane to the union's duties as exclusive bargaining representative" and is not chargeable. *Lehnert,* — U.S. at —, 111 S. Ct. at 1964. Justice Blackmun explained that such litigation "is more akin to lobbying [than bargaining] in both kind and effect." *Id.* at —, 111 S. Ct. at 1963. Justice Marshall dissented from this conclusion, and Justice Scalia did not directly address it. Thus there is no majority holding on this issue in *Lehnert.*

However, we find Justice Blackmun's plurality opinion persuasive. Moreover, it may be inferred from Justice Scalia's discussion of *Ellis* and from other early fair-share cases that a majority of the Court would find extra-unit litigation expenses nonchargeable. In *Ellis,* the Court determined whether certain costs were chargeable under the RLA. With regard to litigation expenses, *Ellis* held that only litigation "incident to negotiating and administering the contract or to settling grievances and disputes arising in the bargaining unit," and "other litigation . . . that concerns bargaining unit employees and is normally conducted by the exclusive representative" is chargeable. *Ellis,* 466 U.S. at 453. Justice Scalia quoted this portion of *Ellis* and noted that "there is good reason to treat" *Ellis* and other early cases "as merely

reflecting the constitutional rule suggested in *Hanson* and later confirmed in *Abood.*" *Lehnert,* — U.S. at —, 111 S. Ct. at 1977-78 (Scalia, J., concurring in part and dissenting in part).

Therefore, we conclude that unless the litigation is directly related to the objecting employee's bargaining unit, it is nonchargeable. Extra-unit litigation fails the first aspect of the *Lehnert* test—it is not germane to the collective bargaining activity of the local union. *See Albro v. Indianapolis Ed. Ass'n,* 585 N.E.2d 666, 672 (Ind. Ct. App. 1992). We do not decide whether the costs of jurisdictional dispute proceedings and impasse mechanisms are chargeable. Because this factual aspect of the case was not sufficiently addressed by WERC, it must be determined on remand whether or to what extent the unions' jurisdictional dispute proceedings and impasse mechanisms relate to the local unions.

### E.

WERC held that every kind of organizing activity is chargeable—organizing within the unit, organizing and seeking recognition as bargaining agent for other units, and defending against efforts by other unions to supplant the union as exclusive representative. *Lehnert* did not address the chargeability of organizing costs.

Applying as we must the *Lehnert* test to organizing costs, it is apparent that such costs are not chargeable. The only possible germane connection between organizing costs and the unions' collective bargaining duties is the theory that any time the union is strengthened, all individual units benefit by increased bargaining power. This rationale was rejected in *Lehnert* with respect to political lobbying expenses, general public relations

110

expenses and extra-unit litigation expenses, and under the compulsion of the United States Supreme Court's determination of a constitutional question, we also reject this rationale. Charging organizing costs may in fact significantly add to the burden of free speech of a nonunion employee who is an opponent of unionism.

In *Ellis*, the Court explained why organizing costs should not be chargeable:

> [W]here a union shop provision is in place and enforced, all employees in the relevant unit are already organized. By definition, therefore, organizing expenses are spent on employees outside the collective-bargaining unit already represented. Using dues exacted from an objecting employee to recruit members among workers outside the bargaining unit can afford only the most attenuated benefits to collective bargaining on behalf of the dues payer.
>
> [T]he free-rider rationale does not extend this far. The image of the smug, self-satisfied nonmember, stirring up resentment by enjoying benefits earned through other employees' time and money, is completely out of place when it comes to the union's overall organizing efforts.

*Ellis*, 466 U.S. at 452. *See Albro*, 585 N.E.2d at 673 (neither offensive nor defensive organizing costs are chargeable under *Ellis* and the second and third criteria of *Lehnert*).

## IV.

The second broad issue we consider is whether the fair-share fee procedure established by the unions in response to *Hudson* satisfies the requirements of *Hudson*.

111

## A.

The initial consideration in this respect is whether *Hudson* may be applied retroactively. WERC held that under the three-part test of *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07 (1971), *Hudson* may be applied retroactively. The unions argue that WERC erred because pre-*Hudson* law did not clearly foreshadow *Hudson*'s procedural requirements. We hold that *Hudson* applies retroactively.

*Chevron* set forth a three-part test for determining retroactivity, which may be summarized as follows:

(1) The decision to be applied prospectively must establish a new principle of law, either by over-ruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed.

(2) Whether retroactive operation will further or retard application of the new rule.

(3) Whether retroactive application would result in substantial injustice to the parties.

*See Chevron,* 404 U.S. at 106–07. Because there is a presumption in favor of retroactive application, all three *Chevron* factors must be satisfied in order for a decision to apply prospectively. *Lowary v. Lexington Local Bd. of Education,* 903 F.2d 422, 426–27 (6th Cir. 1990), *cert. denied,* 111 S. Ct. 385 (1990).

The first *Chevron* condition, referred to as the "clear break" principle, is "the threshold test for determining whether or not a decision should be applied retroactively." *United States v. Johnson,* 457 U.S. 537, 550

n.12 (1982). Every court to rule on the issue, affirmatively or by applying *Hudson* retroactively without analysis, has held that it applies retroactively. *Lowary*, 903 F.2d at 429; *Gilpin v. AFSCME*, 643 F. Supp. 733, 738 (C.D. Ill. 1986), *aff'd*, 875 F.2d 1310 (7th Cir. 1989); *Harrison v. Massachusetts Society of Professors/Faculty Staff Union*, 405 Mass. 56, 62 n.7, 537 N.E.2d 1237 (1989); *Ellis v. Western Airlines*, 652 F. Supp. 938, 939-40 (S.D. Cal. 1986); *McGlumphy v. Fraternal Order of Police*, 633 F. Supp. 1074, 1077-79 (N.D. Ohio 1986). As *Lowary* concluded:

> While *Hudson* did not overrule any prior cases, its procedural requirements were clearly foreshadowed by prior agency shop decisions as well as First Amendment, due process, and fair representation case law.

*Lowary,* 903 F.2d at 429. Thus, *Hudson* was not a "clear break" from prior law.[9] We conclude that *Hudson* must be given retroactive application.

## B.

The first of *Hudson*'s three procedural safeguards for the collection of fair-share fees is that the union must provide "an adequate explanation of the basis for the fee." *Hudson*, 475 U.S. at 310. The Court explained the purpose of this requirement:

> Basic considerations of fairness, as well as concern for the First Amendment rights at stake, also dictate that the potential objectors be given sufficient information to gauge the propriety of the union's fee. Leaving the nonunion employees in the dark about

---

[9]WERC also analyzed the second and third criteria of the *Chevron* test, and concluded that *Hudson* satisfied neither.

the source of the figure for the agency fee—and requiring them to object in order to receive information—does not adequately protect the careful distinctions drawn in *Abood.*

*Id.* at 306. The "careful distinctions" referred to are the differences "between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited." *Abood,* 431 U.S. at 236. The union must identify all of its expenditures, not merely those which in its opinion it concludes are nonchargeable. *Hudson,* 475 U.S. at 306–07.

In a footnote, the Court added the following language, which forms the basis for the Right to Work Foundation's objections to the unions' disclosure:

> We continue to recognize that there are practical reasons why "[a]bsolute precision" in the calculation of the charge to nonmembers cannot be "expected or required." *Allen,* 373 U.S., at 122, quoted in *Abood,* 431 U.S., at 239–240, n.40. Thus, for instance, the Union cannot be faulted for calculating its fee on the basis of its expenses during the preceding year. The Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor. With respect to an item such as the Union's payment of $2,167,000 to its affiliated state and national labor organizations, see n.4, *supra,* for instance, either a showing that none of it was used to subsidize activities for which nonmembers may not be charged, or an explanation of the share that was so used was surely required.

*Hudson,* 475 U.S. at 307 n.18. The Right to Work Foundation objects to two aspects of the unions' disclosure

114

which were upheld by WERC: (1) the failure of the unions to independently audit the breakdown of expenses; and (2) the sufficiency of AFSCME's disclosure.

AFSCME and Council 48 had their general expenses audited, and then broke them down according to the chargeable and nonchargeable criteria. The Right to Work Foundation argues that note 18 of *Hudson* requires an independent audit to verify the unions' breakdown of the various expenses. WERC concluded that because the unions' procedure included 100 percent escrow of challengers' fees while challenges are pending before an impartial decisionmaker, no further audit is necessary. We agree with WERC's conclusion.

*Hudson* indicates that the breakdown of expenses need not be audited if there is a 100 percent escrow of all amounts reasonably in dispute.[10] The Court stated: "If the Union chooses to escrow less than the entire amount, however, it must carefully justify the limited escrow on the basis of the independent audit, and the escrow figure must itself be independently verified." *Hudson,* 475 U.S.

---

[10]It must be noted that the amounts "reasonably in dispute" include all fair-share fees collected from nonunion employees prior to the expiration of the initial objection period. As *Ellis* stated, "[b]y exacting and using full dues, then refunding months later the portion that it was not allowed to exact in the first place, the union effectively charges the employees for activities that are [nonchargeable]." *Ellis,* 466 U.S. at 444. WERC concluded, and we affirm its decision, that in order to deduct a fair-share fee equal to full union dues, the unions must escrow 100 percent of all fair-share fees in an interest-bearing account until the expiration of the objection period, and must continue to escrow 100 percent of the fair-share fees exacted from challenging nonunion employees until the arbitrator determines the properly chargeable amount.

115

at 310 n.23. The purpose of providing the information is to give the nonunion employees notice of the basis of the fee, and the purpose of the escrow is to ensure that objecting nonunion employees' funds are not used, even temporarily, for purposes to which a nonunion employee may object. Without an escrow of the entire amount, a more thorough audit is required to protect this latter interest. With a 100 percent escrow of all fair-share fees reasonably in dispute, it is not.

The audit provided by AFSCME and Council 48 was sufficient to ensure that their expenses were valid; the unions' detailed categories of chargeable and nonchargeable activities provided an "adequate explanation of the basis for the fee." *Id.* at 310.

Whether the expenses were properly broken down according to the chargeable and nonchargeable criteria may be determined later by an impartial decisionmaker. Because all of the challenged fees are placed in an interest-bearing escrow pending resolution of the challenge, there is no danger of any First Amendment violation. Moreover, an auditor does not have the legal authority to make the determination of what activities are chargeable and what are not, and it is unnecessary for notice purposes to require an auditor to determine whether a certain expense was, in fact, a "public advertising" expense or an "organizing" expense. This can be better accomplished by an impartial decisionmaker.[11]

---

[11]The Seventh Circuit noted that requiring an audited breakdown of expenses would make the notice prohibitively complicated, and may actually make a potential objector's decision more difficult. In *Gilpin v. AFSCME,* 875 F.2d 1310, 1316 (7th Cir. 1989), *cert. denied,* 493 U.S. 917 (1989), Judge Posner stated:

The plaintiffs complain that despite its detail the notice does not explain the principles under which, say, $16,788 out of a total of

 The Right to Work Foundation also argues that AFSCME's disclosure was insufficiently explanatory because its general expenses were "neither explained nor sub-divided sufficiently." AFSCME provides the nonunion employees with detailed categories of which activities it considers chargeable and nonchargeable, a list of 18 separate audited expenses, and the amount of each expense which AFSCME determined is chargeable to objecting fee payors. The crux of *Hudson* in this respect is whether the disclosure gave the nonunion employees sufficient information about the amount of and basis for the fee to allow them to object to it intelligently. WERC held AFSCME's disclosure to be sufficient, and we affirm that conclusion as being appropriately reflective of the guidelines of *Hudson.*

## C.

 WERC also upheld the unions' procedure of deducting a fair-share fee equal to full union dues, and requiring nonunion employees object annually within thirty days after the notice is given if they want an advance rebate. The Right to Work Foundation challenges the objection requirement on two grounds. First, the Foundation argues that it is unduly burdensome. This argument is meritless. *Abood, Hudson, Lehnert* and other United States Supreme Court decisions in this area make clear that objection is required. "[D]issent is not to be presumed." *Street,* 367 U.S. at 774. The only limitation in *Hudson* is that the nonunion employee must have "a reasonably prompt opportunity to challenge the amount

---

$17,445 for "Editorial Services" is chargeable to the agency fee portion of union dues. But if it did, the notice would be as long and complicated as an SEC prospectus.

of the fee before an impartial decisionmaker." *Hudson,* 475 U.S. at 310. As one court stated:

> Since *Hudson* places the burden of objection upon the employees (as contrasted to burden of proof), we do not consider unreasonable the plan's provision that each member be required to object each year so long as the union continues to disclose what it must before objections are required to be made.

*Tierney v. City of Toledo,* 824 F.2d 1497, 1506 (6th Cir. 1987). *See also Mitchell v. Los Angeles Unified School District,* No. 90-56180 (9th Cir. April 29, 1992). This conclusion is equally valid here; the unions' requirement of annual objection is reasonable.

Second, the Right to Work Foundation argues that the objection requirement violates MERA. The Foundation asserts that MERA requires an advance rebate of the nonchargeable amount to all nonunion employees, regardless of any objection. The Foundation notes that sec. 111.70(1)(f), Stats., defines a fair-share as the "proportionate share of the cost of the collective bargaining process and contract administration measured by the amount of dues uniformly required of all members," and that in *Browne II* we stated that "it is an unfair labor practice to require a municipal employee to pay for anything more than their proportionate share of the cost of collective bargaining and contract administration." *Browne II,* 83 Wis. 2d at 334-35 n.9. The Foundation concludes that the function of an "objection" is not to object to payment of nonchargeable expenses, but merely to challenge the unions' calculation of such expenses.

This argument of the Right to Work Foundation is also without merit. *Hudson* reiterated the principle that

a nonunion employee's objection to payment of nonchargeable expenses will not be presumed:

> The nonmember's "burden" is simply the obligation to make his objection known. See *Machinists v. Street*, 367 U.S., at 774 ("[D]issent is not to be presumed—it must affirmatively be made known to the union by the dissenting employee"); *Railway Clerks v. Allen*, 373 U.S., at 119; *Abood*, 431 U.S., at 238.

*Hudson*, 475 U.S. at 306 n.16. The language in *Street* indicates beyond question that the "objection" required of the nonunion employee refers in the first instance to the *use* of the funds, not merely the calculation of the funds: "Any remedies, however, would properly be granted only to employees who have made known to the union officials that they do not desire their funds to be used for political causes to which they object." *Street*, 367 U.S. at 774. To the extent that *Browne II* indicates that an advance rebate is required for all nonunion employees, that language is withdrawn. It is a prohibited practice under MERA only where the union exacts fair-share fees absent the *Hudson* safeguards or where the unions use, over an employee's objection, fair-share fees for nonchargeable purposes.[12]

---

[12]As we indicated *supra* at p. 115 n.10, the unions must escrow 100 percent of all fair-share fees in an interest-bearing account until the expiration of the objection period to ensure that an objector's fees are not used, even temporarily, for nonchargeable purposes. Additionally, we note that the amounts refunded to objectors and challengers must be refunded with interest. It is equally constitutionally objectionable for the municipal employers to earn interest from nonchargeable amounts.

## D.

The second of *Hudson*'s three procedural safeguards is that there must be "a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker." *Hudson,* 475 U.S. at 310. WERC upheld the unions' challenge requirement, which allows objecting employees to challenge the unions' calculation of the nonchargeable amount before an impartial arbitrator. The arbitrator's decision is binding only on the challenging nonunion employees.

The Right to Work Foundation argues that the arbitrator's decision should apply to all nonunion employees, not merely the challengers. The Foundation asserts that this extra hurdle of requiring not only an "objection," but also a "challenge" is unwarranted, and ignores the command in *Hudson* that "the procedure be carefully tailored to minimize the infringement" on nonunion employees' rights. *Hudson,* 475 U.S. at 303. In conformity with the teachings of *Hudson,* we reject the Foundation's position.

The fair-share scheme discussed in *Hudson* involved an automatic advance rebate. The Chicago Teachers Union (CTU) deducted only 95 percent of full union dues from all nonunion employees, the percentage it calculated was chargeable. The question involved in *Hudson* was what procedural safeguards are required to allow nonunion employees to challenge intelligently the union's calculation of the nonchargeable amount. The CTU procedure presumed an objection to expenditure of fair-share fees for nonchargeable expenses. Previous cases make clear that such a presumption is not constitutionally required. *See supra,* pp. 118–120 (concluding that full union dues may be deducted absent objection). Therefore the analysis in *Hudson* presumes an original

objection and sets forth the requirements for protecting a nonunion employee's right to challenge the union's determination of the chargeable amount.

The unions' challenge procedure in this case is thus constitutionally valid as long as it meets the requirements of *Hudson.* Objection need not be presumed at either level—objection to the use of fees for nonchargeable activities, or objection to the unions' determination of the nonchargeable amount. It is consistent with *Hudson* to limit the effect of the arbitrator's decision to challengers. Where the notice provisions are adequate, objecting nonunion employees who fail to challenge the unions' calculation of the nonchargeable amount waive any challenge to that calculation.

### E.

Under the unions' procedures, AFSCME's and Council 48's expenditures were audited, but the local unions' expenditures were not. Also, the notice did not set forth the major categories of the local unions' expenses. The notice explained that: "Council 48 has determined that the percentage of chargeable activities of these local unions is at least as great as the percentage of chargeable activities of Council 48." This is commonly referred to as a "local presumption."

WERC rejected this presumption, and also held that the local unions must provide greater information regarding their expenses:

> As to the information provided in the notice for the affiliated local unions, there is only an unverified single amount that is alleged to represent the total expenses for all of these locals. There is neither a sufficient breakdown and explanation of the

121

expenses, nor an audit of such figures. While we recognize the practical problems with requiring the unions to provide such information as to the locals' expenditures, we cannot accept, and do not read the Court in *Hudson* as accepting, a presumption as to the chargeable portion of locals' expenses based upon a union official's experience.

However, WERC fashioned a modified local presumption, stating:

> We think that were an independent auditor to take a random sampling of a representative number of the local unions and audit their records, and if that sampling established to the auditor's satisfaction that the locals' expenditures always have a lesser percentage of non-chargeable expenses than does Respondent District Council 48, such a presumption would be established and would be sufficient for notice purposes.

The unions argue that these requirements are unnecessary under *Hudson,* and also that they are unduly burdensome. The unions stress the language in *Hudson,* 475 U.S. at 307 n.18, that the union need not provide an "exhaustive and detailed list of all its expenditures," and that "absolute precision" is not required in calculating the chargeable amount. According to the unions, WERC's decision erroneously overlooks the practical difficulties of such requirements on small local unions. The Right to Work Foundation responds that *Hudson* specifically requires a local audit, while WERC asserts that its modified presumption is constitutionally sufficient. We agree with WERC that a modified presumption satisfies *Hudson.*

The local presumption implemented by the unions, based solely upon a union official's personal experience and no statistical evidence, is clearly insufficient under

*Hudson.* An independent audit of the local unions, to some degree, is required by *Hudson.* The text of note 18 of *Hudson* refers to the local union (Chicago Teachers Union, Local No. 1), and states that "adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor." *Hudson,* 475 U.S. at 307 n.18. Thus *Hudson* requires an independent local union audit. Other courts have also rejected a broad "local presumption." *Lowary,* 903 F.2d at 432, states:

> Requiring nonmembers to contribute to the cost of collective bargaining involves a substantial interference with their First Amendment right of freedom of association. Although it may be somewhat burdensome on the unions, full disclosure of financial information is a minimal requirement in exchange for this interference. *Hudson* and a due regard for First Amendment values lead to this conclusion. The union must provide detailed information so that the dissenting teachers can understand why they are being charged. Only then can they make an informed decision.

*See also Hohe v. Casey,* No. 91–5002 (3rd Cir. Feb. 10, 1992), slip op. at 23–26; *Lehnert v. Ferris Faculty Ass'n,* 707 F. Supp. 1473, 1479–80 (W.D. Mich. 1988), *aff'd,* 893 F.2d 111 (6th Cir. 1989), *cert. denied sub nom., Lindsay v. Ferris Faculty Ass'n,* 110 S. Ct. 267 (1990).

While a broad local presumption is insufficient, we conclude that WERC's modified presumption—auditing a random sampling of a representative number of local unions—satisfies *Hudson.* It is fairer to the local unions to allow such a presumption, and it is consistent with WERC's broad authority to fashion an appropriate remedy. The language of *Hudson* is unequivocal that an

independent audit is required, but it does not specify to what extent. To minimize the burden on the local unions, and because fair notice, not precision, is the goal of *Hudson,* we conclude that the independent auditor need only verify, upon a random sampling of a representative number of the local unions, that the locals' expenditures always have a lesser percentage of nonchargeable expenses than District Council 48. That assessment, if challenged, must be reviewed by the arbitrator.[13]

F.

Finally, the unions object to WERC's determination that the escrowed funds must be in the control of a neutral third party, because WERC "has made no findings that the escrow account established by AFSCME District Council 48 is a subterfuge for AFSCME's use of the disputed fair share fees." The fact that the present arrangement is not a subterfuge is irrelevant. Escrow has an accepted legal meaning. Black's Law Dictionary 489 (5th ed. 1979) provides in relevant part:

> **Escrow.** A writing, deed, money, stock, or other property delivered by the grantor, promisor or obligor *into the hands of a third person,* to be held by the latter until the happening of a contingency or performance of a condition, and then by him delivered to the grantee, promisee or obligee. [Emphasis added.]

---

[13]Of course if the independent auditor determines that the locals' expenditures do not always have a lesser percentage of nonchargeable expenses than District 48, an independent audit of each local union is required.

The unions must escrow the collected fees in an account controlled by a neutral third party. Here the "escrowed" funds were in a segregated account completely in the control and ownership of the unions and did not constitute a true escrow.

## V.

WERC held that the employers did not commit a prohibited practice by deducting the fees, because "there is no evidence or argument that the [employers] have taken any action other than to comply with the terms of a provision of their respective collective bargaining agreements with the local unions, as required by law, by acting as a conduit for the Respondent Unions." WERC has substantial expertise in determining whether a prohibited practice has occurred, and we give its determination great weight. The Right to Work Foundation challenges WERC's conclusion, arguing that the employer as well as the union has an affirmative duty to ensure that adequate safeguards are in place before fair-share fees are deducted. While we agree that federal courts have established a duty on behalf of the employers to ensure that *Hudson* is complied with, we affirm WERC's conclusion that the employers in this case did not commit a prohibited practice under MERA.

*Hudson* provides that "*the government* and union have a responsibility to provide procedures that minimize that impingement and that facilitate a nonunion employee's ability to protect his rights." *Hudson,* 475 U.S. at 307–08 n.20 (emphasis added). *See also Gilpin v. AFSCME,* 875 F.2d 1310, 1312 (7th Cir. 1989), *cert. denied,* 493 U.S. 917 (1989) ("[B]oth the public employer and the union can be held liable in a suit under 42 U.S.C. sec. 1983 for violating the nonmembers' right

of free speech under the First Amendment."); *Hohe v. Casey,* No. 91–5002 (3rd Cir. Feb. 10, 1992), slip op. at 14 ("[B]oth the public employer and the exclusive representative shall be accountable for the constitutional violation."). Thus it is clear that the employer has an affirmative duty under *Hudson* to ensure that proper procedures are established before it deducts fair-share amounts from a nonunion employee's paycheck.

Section 111.70(3)(a)1, Stats., provides that "it is a prohibited practice for a municipal employer . . . [t]o interfere with, restrain or coerce municipal employes in the exercise of their rights guaranteed in sub. (2)." Section 111.70(2), Stats., states that municipal employees have a right to refrain from union activities "except that employes may be required to pay dues in the manner provided in a fair-share agreement." We agree with WERC that an employer's failure to ensure that the unions' fair-share fee procedures satisfy *Hudson* does not constitute "interference" with an employee's right to refrain from union activity, and that the employer's deduction of fair-share fees pursuant to the agreement also does not implicate a prohibited practice.

MERA is designed to facilitate peaceful employment relations in the public sector, *see* sec. 111.70(6), Stats., and we conclude that requiring oversight by the employers of the unions' fair-share fee procedures may potentially undermine that design. It is the union and not the employer that benefits from the imposition of fair-share fees, and nothing in MERA nor the cases interpreting MERA indicates that a municipal employer commits a prohibited practice by failing to ensure that the unions' fair-share fee procedures meet constitutional muster. Indeed, sec. 111.70(3)(a)3, provides that it is a prohibited practice for a municipal employer "[t]o

126

encourage or discourage a membership in any labor organization by discrimination in regard to hiring, tenure, or other terms of employment; *but the prohibition shall not apply to a fair-share agreement.*" (Emphasis supplied.)

## VI.

### A.

Finally, we consider the propriety of the relief ordered by WERC. As part of its prospective relief, WERC ordered the unions to place into an interest-bearing escrow account 100 percent of the fair-share fees deducted from all nonunion employees from the date of *Hudson,* plus 7 percent interest from the date of deduction, until the unions establish proper procedural safeguards. When those procedural safeguards are in place, the escrowed amounts will be disbursed in accordance with those procedures.

The unions first argue that WERC acted beyond its jurisdiction in fashioning this remedy. The unions assert that such an order amounts to a "defacto certification" of a class of all nonunion employees, and that WERC has no power to certify a class or to expand an already certified class. The unions cite WERC's decision in the underlying *Johnson* case (consolidated with this action in 1986 for rehearing in light of *Hudson,* see *supra,* p. 6), wherein WERC denied a request for certification because the action had not been certified as a class action prior to the circuit court's referral to WERC. The unions also cite *Gilpin,* 875 F.2d at 1313, where the Seventh Circuit affirmed the district court's refusal to certify a class because of the potential "serious conflict" between nonunion employees hostile to the union and nonunion employees merely taking a free ride. Neither

127

decision is controlling, however, because WERC did not certify a class in this case—it merely fashioned a remedy which in effect enabled the unions to avoid committing a prohibited practice.

This court has held that "[t]here is no doubt that the WERC has substantial remedial powers to fashion remedies to effectuate the purpose of the statute for fair employment and peaceful negotiation and settlement of municipal labor disputes." *Bd. of Education v. WERC,* 52 Wis. 2d 625, 635, 191 N.W.2d 242 (1971). *See also Libby, McNeill & Libby v. WERC,* 48 Wis. 2d 272, 286-87, 179 N.W.2d 805 (1970); and *WERC v. Evansville,* 69 Wis. 2d 140, 158, 230 N.W.2d 688 (1975). These cases establish that WERC's choice of remedy should be given substantial deference, and should not be set aside unless it is outside the legal authority of WERC or the "order is a patent attempt to achieve ends other than those contemplated by [MERA] . . .." *Evansville,* 69 Wis. 2d at 166-67.

The prospective remedial order in this case was within WERC's legal authority, and was intended to effectuate the purposes of MERA. The order clearly addresses and prevents a prohibited practice—the deduction and use of fair-share fees without sufficient procedural safeguards. The unions cannot insist on continuing a prohibited practice with regard to a specific class of individuals merely because those individuals did not object to it. In *Lowary,* 903 F.2d at 430, the court held that a nonobjecting nonunion employee could not be penalized for failing to follow constitutionally inadequate objection procedures. Because the *Hudson* procedural safeguards exist in order to allow nonunion employees to decide intelligently whether to object to the fair-share fee, and because even the temporary use of

128

nonchargeable amounts from objecting fee payors must be avoided, WERC properly ordered the unions to escrow all fair-share fees deducted from the date of *Hudson* until adequate procedures are established.[14]

The unions also argue that WERC's order to escrow 100 percent of all fair-share fees denies the unions money which they are unquestionably entitled to retain. This argument is misplaced. Until the unions comply with *Hudson,* they are not entitled to the use of any fair-share fees.

The unions' argument appears to be that there are some amounts which may never be objected to as nonchargeable, and therefore such amounts are collectible regardless of compliance with *Hudson.* The language of *Hudson* clearly indicates that these categories of expenses, which no employee could challenge as nonchargeable, arise only after proper notice and only where there is an independent audit of the breakdown of expenses:

> If, for example, the original disclosure by the Union had included a certified public accountant's verified breakdown of expenditures, including some categories that no dissenter could reasonably challenge, there would be no reason to escrow the portion of the nonmember's fees that would be represented by those categories.[23]

---

[14]We note that WERC could have gone further and ordered the unions to escrow 100 percent of all fair-share fees ever collected until all nonunion employees had a proper opportunity to object or challenge the fees. WERC declined to do so, and we also decline to do so. Such an order would be nearly as punitive a remedy as the retributive restitution sought by the National Right to Work Foundation.

If the Union chooses to escrow less than the entire amount, however, it must carefully justify the limited escrow on the basis of the independent audit, and the escrow figure must itself be independently verified.

*Hudson,* 475 U.S. at 310. The Court was referring in this passage to the escrow of the amounts reasonably in dispute after proper notice was provided. WERC's order requiring 100 percent of all fair-share fees collected after the date of *Hudson* is effective only until the unions' procedures comply with *Hudson.* The escrow ordered by WERC does not permanently deprive the unions of anything. Once the appropriate procedures are in place and approved, the escrowed money will be disbursed as provided in the procedures. At this point, the unions will receive the full dues amount from non-objectors, and the fair-share amount from objectors.[15] Before the appropriate procedures are in place, the union is not entitled to retain or use anything.[16]

### B.

WERC held that the unions' notice requirements for challengers were procedurally defective, both in the

[15]If, however, the objectors challenge the unions' determination of the nonchargeable amount, their deductions must remain escrowed until the arbitrator determines the proper fair-share fee. *Hudson,* 475 U.S. at 310.

[16]Moreover, as discussed *supra* at pp. 115–117, the unions' procedure does not include a certified public accountant's verification of the breakdown of expenses, and the only reason WERC upheld that portion of the scheme is because of the 100 percent escrow of the challenged amounts. Thus, even after the unions' procedures meet the requirements of *Hudson,* the unions must escrow 100 percent of all fees reasonably in dispute.

requirement of certified mail and a contribution of $5.00 to the cost of the arbitration, and in the failure to put nonunion employees on notice that failure to challenge waives the right to receive the benefits of an arbitration decision. Accordingly, WERC vacated the arbitrator's decision in this case and held that a new objection and challenge period and a new arbitration were required. The unions appeal this decision because they claim that the objectors voluntarily chose not to participate in the arbitration hearing.[17] The unions assert that because all of the objectors were ordered to be challengers as a matter of law, they cannot be prejudiced by the defective notice. We disagree.

First, it is reasonable for WERC to conclude that a faulty notice provision taints the entire arbitration process. The propriety and effect of arbitration procedures is a matter in which WERC has great expertise, and we give WERC's decision in this respect great weight.

Second, because the unions' general notice provisions were defective, i.e., the local unions' disclosure was inadequate and unaudited, the arbitration must necessarily be vacated because the potential objectors who failed to object because of insufficient information may now object and are entitled to challenge the unions' determination and participate in the arbitration. Arbitration is appropriate only after *Hudson* has been complied with. *See Lucid v. City and County of San Francisco,* 136 L.R.R.M. (BNA) 2877, 2880–81 (N.D. Cal. 1991) ("[A]rbitration as contemplated by *Hudson* is limited to resolving disputes over the *amount* of the agency fee *once* constitutionally adequate disclosures have been made and an objection is lodged.") (emphasis in origi-

[17]The unions do not challenge WERC's determination that its notice was defective.

131

nal). The *Lucid* court also held that the union could not insist that nonunion employees participate in arbitration if the unions have not given them adequate disclosure. *Id.* at 2880 n.3.

## C.

After vacating the arbitrator's award, WERC ordered the unions to escrow in an interest-bearing account an amount equal to all the fair-share fees collected from complainants between January 1, 1983[18] and March 4, 1986, the date of *Hudson,* plus interest at the rate of 7 percent per annum from the date the fees were deducted, and that an impartial decisionmaker would determine the properly chargeable amount for those years. The nonchargeable amount, along with the 7 percent interest and any interest earned by the escrow account, are to be refunded to the complainants.

The Right to Work Foundation asserts that this retrospective remedy is "woefully inadequate," and that the proper remedy is restitution to all nonunion employees of all fair-share fees collected by the unions after January 1, 1983, and issuance of a cease-and-desist order barring further collection absent compliance with *Hudson.* The argument supporting such relief is simply that the unions are entitled to nothing absent the *Hudson* safeguards. WERC rejected this argument because "to refund all of the fees collected from Complainants would result in a 'windfall' to Complainants and would be the equivalent of awarding 'punitive damages' against the Respondent Unions." Additionally, WERC noted that because MERA requires the unions to represent all employees in the bargaining unit, including the nonun-

---

[18]The parties entered a stipulation concerning the fair-share fees deducted prior to 1983.

ion employees, such relief is inconsistent with the government's interest in labor peace and avoiding free riders.

We hold that WERC did not abuse its discretion by refusing the Right to Work Foundation's requested remedy. In the fair-share fee context, the United States Supreme Court has identified two primary policy objectives: "to require every employee to contribute to the cost of collective-bargaining activities," *Abood,* 431 U.S. at 237, and to protect nonunion employees from "compulsory subsidization of ideological activity." *Id.* The latter interest must not be allowed to eviscerate the former, for to so interpret *Hudson* is to exalt form over substance. The unions' failure to provide adequate notice concerning the basis for the fair-share fee should not be transmuted into a loss of fees to which, upon establishment of proper procedures, it is unquestionably entitled. Depriving unions of amounts to which they are clearly entitled is punitive in nature, and squares neither with the government's interest in promoting labor peace by avoiding free riders nor with the government's interest in assuring that fair-share fee deductions minimally interfere with nonunion employees' First Amendment rights. The nonunion employees' rights are sufficiently protected by requiring the unions to refund the excess amounts deducted, plus interest from the date of the deduction. *See Street,* 367 U.S. at 771–75.

WERC has broad authority to "order the remedy most consistent with the public interest," *Appleton Chair Corp. v. Carpenters Local 1748,* 239 Wis. 337, 343, 1 N.W.2d 188 (1941), and it is most reasonable to conclude that it is not in the public interest to punish the unions for technically insufficient procedural safeguards. As Judge Posner stated:

> Not only would the "restitution" that the [Right to Work] Foundation seeks confer a windfall on the nonunion employees but it might embarrass the union financially. Yet those nonunion employees who, while not wanting to pay more (and perhaps even wanting to pay less) than their "fair share" fees, have no desire to ruin the union or impair its ability to represent them effectively might not want so punitive a remedy.

*Gilpin,* 875 F.2d at 1313. *See also Lowary,* 903 F.2d at 432–33. We agree, and affirm WERC's order regarding the fair-share fees deducted between January 1, 1983 and March 4, 1986, the date of *Hudson.*

In conclusion, we hold that political and ideological lobbying, extra-unit litigation and organizing are nonchargeable activities. We conclude that *Hudson* applies retroactively, and that the unions' fair-share fee procedure is defective because there was no independent audit to determine whether the local unions' percentage of nonchargeable expenses was in fact less than that of Council 48. We also conclude that while municipal employers have a duty under federal law to ensure that the unions' procedure satisfies *Hudson,* their failure to do so is not a prohibited practice. Finally, we affirm WERC's prospective and retrospective relief, and reject the Right to Work Foundation's request for punitive restitution.

We remand the case to the circuit court with instructions to remand the case to WERC for a determination of the chargeability of the unions' activities in light of *Lehnert* and this opinion, and for a determination of whether the unions' current procedures meet the requirements of *Hudson.*

*By the Court.*—Affirmed in part, reversed in part, and remanded.

BABLITCH, WILLIAM A., J. *(dissenting in part).* Although I agree with much of the majority opinion, I must respectfully dissent to two of the majority's conclusions: 1) The majority concluded that litigation expenses with respect to concerted activity and collective bargaining are chargeable only if they are directly related to the objecting employee's bargaining unit; and, 2) The majority concluded that organizing expenses are nonchargeable to the objecting employee.

*Litigation Expenses.* WERC held that jurisdictional dispute proceedings, impasse mechanisms, and litigation relating to concerted activity and collective bargaining are chargeable. I would defer to that holding. Alternatively, I would hold that such expenses are chargeable so long as the benefit was direct or indirect, and would remand the case to WERC for factual findings. I would set the same standard for litigation expenses relating to jurisdictional dispute proceedings and impasse mechanisms, and remand for appropriate findings.

*Organizing Expenses.* WERC held that the costs for organizing within and outside the nonmembers' bargaining units, the costs in seeking exclusive representation rights in other bargaining units, and the costs for defending against efforts by other organizations to oust those unions from units they represent are chargeable. I agree with WERC. All such organizing activities are essential to the basic strength of the union structure, and therefore, contrary to the assertion of the majority, germane to collective bargaining. The stronger the structure, the more benefits inure to all employees because of the ability of the union to bargain collectively with the

employer and to serve all the employees. *Lehnert* did not address this issue and does not compel the result reached by the majority.

Accordingly, I dissent from the above two parts of the majority opinion.

I am authorized to state that JUSTICE SHIRLEY S. ABRAHAMSON joins in this dissent.